McCulloch      *M. M. Ray* and *T. A. McFarland*, for the appellants.
v.
The State.     *W. Herod* and *S. Stansifer*, for the appellee (1).


(1) Counsel for the appellee cited 2 Dall. 313; 1 Penn. State R. 309; — U. S. Dig. 401, § 100.


————————

McCULLOCH *v.* THE STATE.

By sections 3 and 79 of the charter of the *Bank of the State of Indiana*, the books were to be closed when the requisite amount of stock was subscribed; but all who were present at the place designated, between the hours prescribed, were, if desirous of subscribing, entitled to do so.

And if sub-commissioners appointed under that act, intentionally prevented persons from subscribing, they committed a fraud upon such persons, and the persons defrauded might have a remedy; but if the required amount of stock was taken, and those provisions of the act substantially complied with, the state was not defrauded by the irregularity, and an information, in the nature of a writ of *quo warranto*, would not, for that cause, lie; because the state, in pursuance of the charter, assumed, through her agents, the superintendence of the subscriptions, and the corporation, not then being in existence, could have no control over the proceedings of the agents, and, hence, could not, as now organized, be charged by the state with the *mala fides* of such agents.

An averment in such an information, that the persons elected directors, &c., had before and at the time of their election and their pretended organization, &c., full knowledge of all the frauds, &c., alleged in the complaint, is bad, it not being averred that these persons, or any of them, were stockholders when the bank became a corporation, or parties in interest when the suit was commenced.

It cannot be intended that the present stockholders had notice of the manner in which the subscriptions were originally made; but if they had such notice, it would be no reason why the state should complain.

The journals of the General Assembly cannot be contradicted or impeached on the ground of mistake or fraud. They are conclusive evidence of the facts which appear on their face. The house keeping the journal is the only tribunal by which it can be corrected.

The Courts cannot, even on the complaint of the state, inquire into the motives by which members of the General Assembly were governed in the enactment of a statute.

*Wright v. Defrees*, 8 Ind. R. 298, adhered to.

Where the legislative journals are silent touching a step in the proceedings which the constitution requires to be taken, it will be presumed by the Courts that the constitutional requirement was complied with.

Where a bill originating in the senate was passed by the house of representatives with amendments and returned to the senate, *held*, that a simple concurrence in the amendments was sufficient.

Where the legislative journals, on their face, show that a bill on its final passage did not receive the votes of a majority of all the members elected, the bill is a nullity; for there is a defect of power.

Nov. Term,
1858.

McCulloch
v.
The State.

APPEAL from the *Marion* Circuit Court.

DAVISON, J.—The complaint in this case, being an information in the nature of a writ of *quo warranto*, alleges that there is an association of persons transacting business as a banking corporation in this state, having their principal office at *Indianapolis*, called by themselves " *The Bank of the State of Indiana*," of which association *Hugh McCulloch* is the acting president, and *James M. Ray* the acting cashier, who are members of the association—which association, and said *McCulloch* and *Ray*, are made defendants. It is further alleged, that the association claims to be a lawful corporation, under a pretended law of this state, entitled "An act to establish a bank with branches;" and that they have assumed to act and are acting as such, exercising the powers and franchises attempted to be conferred by the provisions of said pretended act, but all without authority of law; that the pretended act was and is null and void; that the passage thereof was by the fraud and bribery of several of the members who voted for the same; that it was passed in both houses without a constitutional majority of either house, and by other unconstitutional and illegal means; and that the association and its branches were organized and put in operation by irregular, illegal, and fraudulent practices. After these general averments, the complaint proceeds in five paragraphs, and concludes with a prayer that the defendants be enjoined from the exercise of the powers and franchises named in the act, &c.; and for general relief, &c.

The defendants demurred to the whole complaint, and to each paragraph, severally. The demurrers to the whole complaint, and to the third paragraph, were overruled. To

Tuesday,
January 4,
1859.

the other paragraphs, they were sustained. Upon final hearing, there was judgment for the defendants.

The first paragraph charges that the persons named in the act, as commissioners, met at *Indianapolis* within the time prescribed, &c.; divided the state into seventeen bank districts; pretended to locate each district; and appointed two sub-commissioners for each, to receive subscriptions to the capital stock in the several branches; that under their management, stock to the required amount in each branch was subscribed; and that, thereupon, delegates were appointed by the several branches, who met at *Indianapolis*, and pretended to organize "*The Bank of the State of Indiana*"—elected a president and cashier—formed a board of directors, consisting of a delegate from and of each branch—and filed in the office of the secretary of state a paper purporting to be a statement of the proceedings in the organization of the bank and branches—by virtue of all which, they claim to be a lawful corporation, and are acting as such; but it is averred that the proceedings of the commissioners and sub-commissioners were and are void, because—

1. The sub-commissioners so acted in and conducted the opening and closing of the books for subscription, as to prevent and exclude many persons from subscribing to the capital stock in each and all of the branches who desired to do so, and who were entitled to subscribe.

2. That they secretly and fraudulently opened and closed the subscription books so as to enable only those persons to subscribe who had been previously named and fixed upon by the persons who had procured the passage of the pretended act of the legislature, and their confederates.

3. That the sub-commissioners, and each of them, fraudulently kept away from the places appointed for subscribing, and kept the subscription books also away, and out of the view of all persons desirous to subscribe, except the favored persons, till five or ten minutes before the hour of twelve o'clock, *M.*, the hour for closing the books, and allowed no one to subscribe till all the stock had been taken by and in the name of the defendants and their confeder-

ates, and then instantly closed the books, whereby large numbers of citizens of the state, at each of the branches, were excluded, viz., *John Hunt, William T. Dennis, John Robbins*, and others.

4. That, for the purpose of giving all the stock to the defendants and their confederates, the sub-commissioners, fraudulently and in contravention of the meaning and intent of the act, permitted the defendants and their confederates to take all the stock in the several branches, excluding all others, they, the commissioners and sub-commissioners, declaring and giving out in speeches beforehand that none but them, and those who had taken an interest in the passage of the act, would be permitted to subscribe; that thus the defendants and their confederates monopolized all the stock in the several branches; and that the persons claiming to have been elected directors in the several branches, and in the pretended bank, had full knowledge of all the frauds, &c., herein charged, at and before their several elections, and their organization as branch boards and bank boards.

This paragraph, in effect, concedes the validity of the act incorporating the bank, and directly admits that the required amount of stock was taken; but complains that many citizens who desired to subscribe for stock were, by the fraudulent conduct of others, namely, the officers appointed to open the books, and those who were instrumental in procuring the passage of the act, prevented from making subscriptions. The act itself appoints five commissioners, who are directed to meet at *Indianapolis* within ninety days after its passage, and divide the state into not less than fifteen, nor more than twenty bank districts, to locate a branch in each district, and appoint two sub-commissioners for each district, to receive subscriptions for stock, &c. The sub-commissioners are required to open books between the hours of nine and twelve o'clock, *A. M.*, on the days and at the place specified, &c.; and if the requisite amount of stock shall not sooner be subscribed, said books may be kept open between the same hours each day, for the space of thirty days. If more than the requi-

site amount shall be subscribed while the books are open for any branch, the excess shall be taken, in proportion, from subscribers over 1,000 dollars, until all are reduced to that amount, and then from all equally, &c. Acts of 1855, pp. 229, 245, §§ 3, 79. These sections allow the books to be closed when the requisite amount of stock shall be subscribed; but they evidently intend that all who are present at the place designated, between the hours prescribed, if desirous of subscribing, shall be allowed to do so. And, here, the sub-commissioners, having intentionally prevented the persons named, and others, from making subscriptions, acted not only without the intent of the law, but committed direct fraud upon all who were thus deprived of the right of subscribing. They did not, however, commit a fraud upon the state. So far as she was concerned, they were guilty of a mere irregularity. The required amount of stock was taken. That requirement of the act has been substantially complied with. And such being the case, the persons defrauded, and not the state, have the right to complain; because the bank, though her stock was, in the first instance, irregularly subscribed, is not, for that reason, less able to carry out, with safety to the citizens of the state, the objects of her charter. *The Commercial Bank, &c.* v. *The State*, 6 Sm. and Marsh. 599, is, in our opinion, much in point. In that case, which was a proceeding by *quo warranto* against the bank, the charter provided that no person, firm, or corporation, should, in the original subscription for stock, on any one day, subscribe, directly or indirectly, or procure any other person to subscribe with the understanding that it should be transferred after the books were closed, for more than fifty shares of stock. And, as a ground of forfeiture, it was alleged that more than fifty shares had been subscribed for, in violation of that provision of the charter, and that the stock had been afterwards transferred. *Held*, that these subscriptions being under the superintendence of eight commissioners named in the charter, and under their supervision, before the bank had a corporate existence, the bank, as such, could not be held responsible.

In this case, the state, in pursuance of the act before us, assumed, through her own agents, the superintendence of the subscriptions. Over the proceedings of these agents, the corporation could have no control; because they acted in advance of its existence. Hence, the state cannot, with any degree of propriety, be allowed to charge the corporation, as now organized, with the *mala fides* of those who controlled the original subscriptions. There is, it is true, an averment to the effect that the persons elected directors, &c., had, before and at the time of their election, and their pretended organization as branch boards and bank boards, full knowledge of all the frauds, &c., alleged in the complaint. Still it is not averred that these persons, or any of them, were stockholders in the bank when it became a corporation, or parties in interest when this suit was commenced. For aught that appears, the ownership of the stock originally subscribed may have all changed hands, and those who did subscribe under the supervision of the sub-commissioner, may not now hold any stock in the corporation. It cannot, therefore, be intended that the present stockholders had notice of the manner in which the subscriptions were originally made. But suppose they had such notice, it would be no reason why the state should complain. As we have seen, the stock was taken under the superintendence of her own agents—the requisite amount was subscribed—and, in addition, the corporation stands just as it would have stood had the subscriptions been regularly made. Through the fraudulent conduct of the sub-commissioners, the persons named, and others, may have been deprived of their right of subscribing for stock; but these persons are not complaining. When they do complain, it will then be a proper inquiry whether the law affords them a remedy for the injury which they have sustained. We deem the facts set forth in this paragraph insufficient to constitute a cause of action (1).

The second and fourth paragraphs present the same question, and will, therefore, be considered as being within the same rule of decision. The second avers that the act incorporating the bank was not passed by a majority of

all the members of each branch of the legislature; that two of the members of the house of representatives, viz., *Andrew Humphreys* and *James Wood,* whose names appear in the journal of the house as being present and voting for the bill on its final passage, after the governor's veto, were not present, and did not vote on such final passage—the names of these members being fraudulently recorded in said journal. And the fourth alleges, that on the passage of the bill in the house, before it was vetoed, *James Mc-Murray,* a member whose name appears in the journal recorded in favor of its passage, did not, in fact, vote in its favor, but voted in the negative and against it; that his name was and is recorded in the journal by mistake, fraud, or corruption, as in favor of the bill; and that the bill on its passage did not receive a majority of all the members elected to said house, there being only fifty votes recorded in its favor on its passage, exclusive of the name of *Mc-Murray.*

The facts thus alleged, raise the question, whether the journals of the houses of the General Assembly can be contradicted or impeached on the ground of mistake or fraud. The affirmative of this inquiry cannot, in our opinion, be maintained. Article 4, § 12 of the constitution requires each house to keep a journal of its proceedings, and publish the same. This journal must be held conclusive evidence of the facts which appear on its face; because it must be presumed that the members, as a body, inspected it and made all necessary corrections, before they allowed it to assume the character of a journal of their proceedings. As well might evidence be received to contradict a statute, to show that it contained certain provisions inserted through mistake, as to contradict an entry made upon the journal. The house keeping the journal is the only tribunal by which it can be corrected, and until corrected by such authority it must be considered conclusive as to the facts which it contains. *The State* v. *Moffit,* 5 Ohio R. 358.—*Turley* v. *Logan County,* 17 Ill. R. 151.

We must, therefore, hold that the members alleged to have been absent when the bill passed over the governor's

veto, were present and voted as averred in the journal;
and that *McMurray* did vote in favor of the bill on its
final passage in the house.

In this connection, we are led to notice a question raised
upon the demurrer to the whole complaint. It is averred
that the bill was passed by the fraud, corruption, and brib-
ery of several members of the legislature. In *Wright* v.
*Defrees*, 8 Ind. R. 298, it was held that this Court cannot
inquire by what motives the members of the legislature
were governed in the enactment of a law. That, however,
was a case between citizens; and the Court, in the opin-
ion delivered, use this language: "We say nothing as to
what rights the state may have in a case of this kind.
The state is no party in these proceedings." Thus, the
Court withhold an opinion in regard to the question whe-
ther on the complaint of the state, a law can be impeached
for the fraud, &c., of members voting for it.

In the present case, the state is the plaintiff. But is
there any reason why she, as a party litigant, should be
allowed, more than an individual citizen, to put in issue
the conduct and motives of the legislature, or any of its
members? We know of no principle or authority upon
which an issue of that character can, in any case, be tried
before a judicial tribunal. To institute such an inquiry
would, as said in *Wright* v. *Defrees*, be a direct attack
upon the independence of the legislature, and an usurpa-
tion of power subversive of the constitution. *The Sunbury
and Erie Railroad Co.* v. *Cooper*, 7 Am. Law Reg. 158.

By the fifth paragraph, certain provisions of the act are
alleged to be unconstitutional, which are thus pointed out:

1. It exempts from taxation the capital stock of the
bank for municipal purposes.

2. It gives the bank a lien on the capital stock of all
stockholders for all debts *bona fide* due, &c., although it
declares such stock personal property and subjects it to be
sold on execution against the owner—thereby giving the
bank a privilege not accorded to other citizens.

3. It authorizes indirectly the suspension of specie pay-
ments by the bank, by suspending all suits, &c., against

any branch, when the directors of the bank may suspend such branch—thereby creating a special stay of execution, &c.

4. It limits the number of branches to twenty, and not less than fifteen, in the discretion of the commissioners, declaring counties wherein a branch of the state bank is already established entitled to a branch in such county— thereby conferring a privilege on citizens and classes of citizens which belongs equally to all citizens.

These provisions, as connected with the act of incorporation, were duly considered in *Wright* v. *Defrees, supra.* We adhere to that decision. An act of the legislature may be valid in part and void in part. It follows that, were the provisions to which the paragraph refers stricken out of the act, the validity of the corporation would not be affected. Suppose, then, that they are in conflict with the constitution, their being so would furnish no ground for declaring the whole act void, or enjoining proceedings under it.

The third paragraph avers that the bill in question was not read by sections on three several days in each house; that two-thirds of neither house where it was pending, did dispense with the rule requiring every bill to be so read; nor was any emergency declared, &c. There was an answer to this paragraph, to which the plaintiff demurred; but her demurrer was overruled. The paragraph and answer thus noticed each professes to show, by reference to the journals of both houses, the legislative history of the bill from its introduction till its final passage. The facts believed to be material are these: The bill originated in the senate. It was introduced on the 31st of *January*, 1855, when the rules, by a vote of yeas and nays, were dispensed with, and it was read a first time by its title. Afterwards, on the same day, the rules were again dispensed with, by a vote of yeas and nays, and it was read a second time by its title. On the 7th of *February*, the bill was referred to a committee, who, on the 17th of that month, reported it back to the senate with amendments, when it was made the special order of the day for *Monday* then

next ensuing.   On the 19th of *February*, the report of the committee was concurred in, the amendments adopted, and the bill ordered to be engrossed.   It was read a third time on the 22d, and on the 24th, being the special order of that day, it was passed by a vote of yeas and nays, and the house was informed, &c.   In the house, the bill was, in like manner as in the senate, subjected to a first and second reading, and referred to a committee, who, on the 28th of *February*, 1855, reported it back to the house with amendments, when the report was concurred in, the amendments adopted and ordered to be engrossed.   On the first of *March*, it was read a third time, passed by a vote of yeas and nays, and returned to the senate, where, on the 2d of *March*, the amendments adopted by the house were concurred in, &c.

Thus, it will be seen that the journals fail to show that the bill was, in either house, read by sections, or that an emergency existed; but they do show, affirmatively, that it was read a first and second time by its title only.

The constitution, art. 4, § 18, says:   "Every bill shall be read by sections, on three several days, in each house; unless, in cases of emergency, two-thirds of the house where such bill may be depending shall, by a vote of yeas and nays, deem it expedient to dispense with this rule; but the reading of a bill by sections on its final passage shall in no case be dispensed with, and the vote on the passage of every bill, &c., shall be taken by yeas and nays."

As we have seen, the bill was subjected to a first and second reading, on the same day, by its title.   In accordance with the rule, this could not be done, unless there was a case of emergency and the rule was dispensed with in the mode pointed out by the section to which we have referred.   Are we, then, to presume, the journals being silent on the subject, that the action of the legislature was not in conflict with the constitution?   Presumptions are often indulged, in support of the proceedings of Courts; and it would be difficult to perceive why their proceedings should be entitled to more favor than those of the legislature.   It has been repeatedly decided, that, where the record

of a Court possessing general powers is silent as to whether a party defendant had notice of suit, it will be presumed that the steps necessary to give jurisdiction of the person were properly taken. There is, indeed, no reason why legislative records should be more full and perfect than judicial. The journals, in this instance, aver that the rules, by a vote of yeas and nays, were dispensed with, and the bill read a first and second time by its title. Now, in support of the act in question, it seems to us that we may presume not only that the vote taken was a two-thirds vote, but that there was a case of emergency, within the meaning of the section above quoted. *Carpenter* v. *Montgomery*, 7 Blackf. 415. Nor is it unfair to presume, from the averment, that the bill was read a third time; that it was read by sections. In a well considered case, in which the precise point now under discussion was involved, it was said: "If a strict literal compliance with every constitutional requirement, however minute, is necessary to the validity of a law, and the Courts are bound to hold that nothing was done but what appears in the legislative journals, it is easy to demonstrate that not a single statute enacted since the constitution took effect can be upheld." *Miller* v. *The State*, 3 Ohio R. 475 (2). The language thus used aptly applies to the past legislation of this state, under the new constitution.

But it is argued that the bill, having been amended in the house—having passed that body—and being returned to the senate, where it originated, should, with the amendments, have been passed in the senate by a constitutional majority; that it was not enough that the amendments were simply concurred in. In answer to this, it might be said, that for aught that appears in the journal, the bill may have so passed the senate. But suppose the journal, in reference to the point thus made, shows all that was done; still the proceeding would, in our opinion, be unobjectionable; because the bill, before it was sent to the house, had passed the senate by a majority of all the members elected to that body, and it cannot be assumed that the amendments of the house converted the original into a new bill.

Indeed, such construction might result in the necessity of the whole series of readings being commenced anew every time an amendment is made. We incline to the opinion that, in this instance, the mere concurrence in the amendments was sufficient without any further proceeding by the senate.

It is true, where the journals, on their face, show that a bill on its final passage did not receive, in its favor, [the votes of] a majority of all the members elected, as prescribed by the constitution, the whole legislative proceeding would be a nullity; because, if the requisite number do not vote in the affirmative upon such final passage, there is a defect of power, and no bill so passed can ever have the force of a law. And to this effect are certain *New York* decisions to which we have been referred. The constitution of that state required, on the passage of every bill creating a corporation, the assent of two-thirds of the members elected to each branch of the legislature; and the Courts have decided that they would, for the purpose of ascertaining whether such act was passed by a vote of two-thirds, look behind the printed statute-book, and resort to the journals of each house. 4 Hill, 384.—1 Denio, 11.—2 *id.* 97. These decisions, in our opinion, enounce a proper exposition of the law. For the purpose indicated, Courts may resort to the journals. Still those cases are not applicable to the case at bar, because the bill in question passed both houses by the required vote. What we decide is, that upon the face of the journals, there is enough to induce the conclusion that the statute incorporating the bank was constitutionally enacted. The rulings of the Circuit Court must be sustained.

*Per Curiam.*—The judgment is affirmed with costs.

*J. W. Gordon, J. Morrison,* and *C. A. Ray,* for the state (3).

*T. L. Smith, D. M'Donald,* and *H. O'Neal,* for the appellee (4).

(1) See *Wright* v. *Defrees,* 8 Ind. R. 298.

(2) See *Coleman* v. *Dobbins,* 8 Ind. R. 156, note.

(3) The brief of Messrs. *Morrison* and *Ray,* after a statement of the pleadings, proceeded as follows:

*Marginal note:*

Nov. Term, 1858.

McCulloch v. The State.

Nov. Term,
1858.
────────
McCulloch
v.
The State.

The state has, at all times, a right to inquire into the claims of any office or franchise, and to remove the parties unless they can show a complete legal title. Ang. and Ames on Corp. § 734.

An information lies against those who assume to act as a corporation, to compel them to show cause, by what prescription, statute, or charter, they make title to the franchise, to compel them to show the right.—*Ibid.*

Have the defendants shown a complete legal title? We think they have not; but that, on the contrary, they have shown themselves usurpers.

By demurring to the first paragraph, they admit that the sub-commissioners were guilty of the most unblushing and high-handed malpractices, in regard to their whole duties, utterly disregarding the plainest requirements of the law. But they say, that however corrupt and knavish the sub-commissioners may have been, in the discharge of their important functions, and however much the citizens of the state may have been aggrieved thereby, the defendants and the other stockholders are innocent. We do not admit the plea. They are not innocent on the record. The information distinctly charges them with direct complicity in all that is alleged against the sub-commissioners; that the whole programme was arranged among all the parties, before the commissioners acted; that they and the defendants, and their confederates, were equally guilty; and that the directors of the pretended bank, and of the branches, had full knowledge of all the frauds and malpractices, and irregularities complained of, at and before the time of their several elections.

The relator might not have been able, on trial, to prove these charges, to the extent stated in the complaint, had the defendants denied them; but they ventured to demur, and they must abide the consequences. The question whether the flagrant conduct imputed, is sufficient cause for avoiding the organization of the bank, is now for the first time properly before this Court.

In *Wright* v. *Defrees*, 8 Ind. R. 298, the point was overruled, because the relator was a private person, and had not shown himself injured. That objection does not, however, hold in the present case.

Although the Courts have been liberal in sustaining the organization of corporations, and have exhibited a disposition to overlook mere irregularities, where it appeared that the intention was to comply with the *directions of the law*; they have not yet held that the law might be intentionally disregarded and defied; and therefore the salutary rule, that in putting a corporation in motion, the mode of doing it will be liberally construed, has no application to a case like this; nor will another rule, equally salutary, be overlooked, requiring a substantial performance according to the intent of the charter.

That "it is the duty of all Courts to execute laws according to their true intent and meaning" (5 Ind. R. 550), is no less a dictate of reason, than a maxim of legal ethics; and to hold that a set of interested and corrupt sub-commissioners, have concluded the state, by what they have done, in a case of such high importance, would, it seems to us, be conceding far too much.

The franchises proposed to be conferred by the charter on those who might become shareholders in the bank, were never vested till the organization of the bank was perfected. The organization having been completed, the shareholders would become a corporation. The conditions upon which the subscribers were to become a corporation, and the manner in which that was to be effected, are plainly set forth in the charter. §§ 79, 80, 81. When these several requirements were complied with, and the proper certificate made and

Nov. Term,
1858.

McCulloch
v.
The State.

filed in the secretary's office, containing "a written statement of the proceedings in the organization of said bank, and of each branch, accompanied by the affidavits of the president and cashier, that to the best of their knowledge and belief, said statement is correct, and that said bank and branches have been organized in good faith, and with the intent to carry out the objects of its charter, fairly and honestly—thereupon the said bank shall be duly organized," &c., is the language of the charter.

The bank is thus ostensibly made to stand upon an organization prescribed, and perfected in good faith, fairly and honestly. If we have shown the precise contrary to that, and that the defendants have, in effect, admitted that its pillars are bad faith, unfairness, dishonesty, fraud, corruption, and bribery, then we think their claim to be considered a valid corporation is without foundation.

In *Wright* v. *Defrees*, the Court refused to allow an inquiry into the motives, in voting for the bill; adding, however, this qualification, "we say nothing as to what rights the state may have in a case of this kind." A similar caution was observed in a somewhat similar case, in *Fletcher* v. *Peck*, 6 Cranch, 87, where Ch. J. Marshall withheld an opinion in regard to the question whether a law might be impeached by the state, for the bribery and corruption of the members voting for it—holding that the question did not properly arise in the case, it being a suit between individuals. That objection does not exist in this case; and having averred that the bill was passed by the fraud, and corruption, and bribery of several members of the legislature, we submit the question without further argument.

The 3d paragraph presents a highly important constitutional question. The 18th section of the 4th article of the constitution is as follows :

"Every bill shall be read by sections on three several days in each house ; unless, in case of emergency, two-thirds of the house where such bill may be depending, shall, by a vote of yeas and nays, deem it expedient to dispense with the rule; but the reading of a bill by sections, on its final passage, shall in no case be dispensed with; and the vote, on the passage of every bill or joint resolution, shall be taken by yeas and nays."

The 3d paragraph of the information, as well as the 2d paragraph of the answer to it, shows conclusively that the bill was never "read by sections" in either house. Its first and second readings in the senate, where it originated, were by "its title" merely, and on the same day. Its third reading may or may not have been by sections; for as to that fact the journal is silent. If the intendment that it was so read may be indulged, still, there can be no such intendment in regard to the first and second readings in that body; such an intendment being plainly excluded by the fact that it was read a first and second time by its title.

But it was said in the argument in the Court below, that it was "a case of emergency," and that the rule was, therefore, suspended, as appeared by the journal of the senate.

We consider this a mere assumption. The first entry is :—"Mr. *Witherow* moved to suspend the rules, and read the bill a first time by its title." The "rules" referred to by the mover, were obviously the rules for the transaction of the business of the senate, and not the rule specified in the clause of the constitution above quoted. The suspension of the rules, moved by Mr. *Witherow*, therefore, merely gave the bill precedence over other business that,

by the rules of the house, would be otherwise first in order. But it was urged on the other side, in the Court below, that the motion to suspend the rules, taken in connection with the journal entry, that the yeas and nays were taken "under the constitution," shows with sufficient certainty that the constitutional rule was intended.

We do not think so. There is another constitutional rule under which the yeas and nays are demandable, and to which the motion and entry would be equally applicable. The 12th section of the same article, provides that "the yeas and nays, on any question, shall, at the request of any two members, be entered," &c.

We, therefore, submit, that the journal entry that the yeas and nays were taken under the constitution does not establish the position that the constitutional rule was complied with. As the entry in the journal of the motion for the second reading of the bill, is similar to that on the first reading, it is unnecessary to say anything as to that reading.

If, however, we are wrong in regard to our construction of the senate journal, we think we cannot be in regard to the house journal.

The record is—"Mr. *Smith*, of *Perry*, moved to suspend the rules, and read the bill a first time by its title;" and the question being on suspending the rules, those who voted in the affirmative, were *A. B.*, &c.; so the rules were suspended, and the bill was read a first time by its title."

There is no reference or allusion in this, to "the yeas and nays being taken under the constitution," nor can anything more be legitimately deduced from it, than could be from a similar entry in the journals under the old constitution. We therefore conclude, that the rule requiring every bill to be read by sections on three several days, in each house, was not constitutionally dispensed with, in either the senate or the house.

The other readings in the house are entered thus: "The bill was taken up and read a second time." "The bill was then read a third time."

It will be noticed that the bill was amended in the house in some very important particulars, and the amendments appear to have been concurred in by the senate, without any reading, and without any vote by yeas and nays.

We beg leave to call the special attention of the Court to this fact, in connection with what is said on the same point in *Coleman* v. *Dobbins*, 8 Ind. R. 157.

But it was contended below, that the Court could not go behind the law, to inquire by what vote it was passed; nor inquire into the manner of the legislation upon it; and that, therefore, the law must stand, even if passed in defiance of every constitutional restriction.

Such doctrine was orthodox, some time ago, and in another government; but *Young America* rejects it. Another argument was, that the constitution, in the particular named, is merely directory; a kind of instruction to the members, which, if not observed by them, is nobody's business.

We shall not argue the latter position, but refer the Court to some authorities, with which they are no doubt familiar, in support of the other proposition, to-wit, that the Court may go behind the statute.

In 2 Hill, 31, *The People* v. *Purdy*, Bronson, J., in a dissenting opinion, held, that where the point is raised under the act of the legislature, requiring a two-thirds vote, the Court may look behind the printed statute-book; and that if the original bill on file in the secretary's office, is not certified to have been

passed by a two-thirds vote, it is at least *prima facie* evidence to the contrary.

The reasoning of Judge BRONSON in the above case is unanswerable; and although at the time, he was overruled by the other two judges, yet his position was afterwards fully sustained in the Court of Errors, in 4 Hill, 390, where it was further held by WALWORTH, Chancellor, that the certificate of the secretary of state was not conclusive of the fact that the bill had been passed by a two-thirds vote; and per *Paige* and *Franklin*, senators, that the journal might be resorted to, in ascertaining whether an act was passed by a vote of two-thirds.

In *DeBow* v. *The People*, 1 Denio, 11, it was said by Chief Justice BRONSON: ."Knowing, as we do, from an inspection of the original engrossed bill, on file in the secretary's office, that the general bank law was not passed as a two-thirds bill," &c. And again, referring to a suggested difficulty in regard to the manner of trying the question, whether a law had received the requisite number of votes, he says: "I shall not go into the general discussion of these questions, for the reason that I have done so on former occasions, and because I deem the question now settled."

In the *Commercial Bank of Buffalo* v. *Sparrow and Clark*, 2 Denio, 97, Judge BEARDSLEY, in delivering the opinion of the Court, says: "The act of 1837 was passed as a majority bill, and did not receive the assent of two-thirds of the members of the legislature. This is ascertained by an inspection of the original act in the office of the secretary of state"—citing *DeBow* v. *The People*, *supra*.

See, also, *Coleman* v. *Dobbins*, 8 Ind. R. 157; and the authorities referred to by Judge STUART, in the opinion, and those in the reporter's note 1.

*Coleman* v. *Dobbins*, comes fully up to the principle for which we insist; and unless the Court shall overrule that decision, we think the ruling of the Circuit Court, in this case, must be reversed.

The Court, in *Wright* v. *Defrees*, *supra*, having passed upon the question involved in the fifth paragraph of the information, we submit it now without argument.

(4) No brief for the bank was found among the papers.