THE COMMON COUNCIL OF THE CITY OF DETROIT v.
THE BOARD OF ASSESSORS OF THE CITY
OF DETROIT.

*Constitutional law—Enactment of statute—Legislative journals—*
*Supplement—Taxation of mortgages—Impairing*
*obligation of contracts—Usury—Agree-*
*ment to pay tax.*

1. The tax law of 1891 (Act No. 200) was duly enacted, and the
provisions for the assessment of the mortgage interest in lands,
and for the collection of the tax levied thereon, are
constitutional.

2. The following propositions are summarized from the opinion of
Mr. Justice MONTGOMERY, and are concurred in by MORSE, C.
J., and McGRATH, J.:

   *a*—The statute contemplates an assessment of the interests of
the mortgagor and mortgagee in the land, and it is competent
for the Legislature to cause this entire value to be assessed to
the mortgagor, as has been done for years under prior laws;
and the present act cannot be held invalid because it relieves the
mortgagor from a portion of this assessment only on condition
that the owner of the mortgage interest pays, within a stated
time, the tax levied thereon.

   *b*—Under section 20, which provides that at the request of
any person whose property is assessed, and on sufficient cause
shown, the board of review shall correct the assessment as to
such property, the owner of the fee can be heard as to his own
and the mortgage assessment.

   *c*—The mortgagor will, as under former statutes, be bound to
pay the entire tax, subject only to the relief afforded him if the
tax assessed against the mortgage interest is paid by the
mortgagee; and while the Legislature intended a fee to be sold
in default of payment of the tax assessed on the mortgage
interest, the provision of section 62, that no greater interest in
any parcel of land shall be sold than is sufficient to pay the tax
for which the same is sold, is sufficient protection to both mort-
gagor and mortgagee.

   *d*—The provision authorizing the mortgagor to pay the tax
assessed against the mortgage interest in case of the mortgagee's
default, and deduct the same from the amount owing on the mort-

gage, does not impair the obligation of their contract. The mortgagee may and should pay the tax, and if he fails to do so the State appropriates so much of the fund which the mortgage represents —so much of the estate of the mortgagee in the land—as is necessary to make such payment; and while the State thus interposes between the parties, and excuses the mortgagor from making a payment to the mortgagee which, by the terms of his contract, he would otherwise be bound to make, this is not because of any interference with contract relations, or by virtue of any abrogation of the contract rights of the mortgagee, but because the State has attached or seized so much of the mortgage debt before it has reached the mortgagee.

e—It was competent for the Legislature to treat real-estate mortgages as interests in lands for the purpose of taxation, and, even though held by non-residents of the State, they may be given a *situs* in the place where the mortgaged property is situated.

f—The intent is clear to treat mortgages as real estate for the purpose of taxation, and the interest in real estate so taxed to banks and insurance companies may be deducted from their shares of stock as assessed.

g—Where a mortgage covers land lying in two or more assessment districts, the proportion properly taxable in each district will be that proportion which the land lying in such district bears to the whole land, and, when the assessing officer can inform himself as to those values, there is no reason why he cannot properly make the assessment; and the fact that instances may arise where this will be impossible is a defect which can be remedied by subsequent legislation, and not one which should invalidate the whole scheme involved in the provisions relating to the taxation of mortgages.

h—Where the agreement of the mortgagor as to the payment of taxes is broad enough to cover any assessment which may be made on all interests in the land mortgaged, his undertaking is in no way interfered with or abridged by the act.

i—There is no obstacle, either in this act or in the usury law passed at the same session (Act No. 156, Laws of 1891), to an agreement by the mortgagor to pay all taxes which may in the future be assessed against all interests in real property owned by him, including the interest granted to the mortgagee; such agreement not amounting to a reservation of interest, but being in the nature of an agreement to preserve the estate which constitutes the security, and no more unlawful than an agreement to keep the property insured with a similar purpose.

*Mandamus.* Argued February 3, 1892, and re-argued February 16, 1892. Granted March 18, 1892.

Relator applied for *mandamus* to compel the assessment of mortgages under the tax law of 1891. The facts are stated in the opinion.

*Charles W. Casgrain* and *Charles S. McDonald (A. A. Ellis,* Attorney General, of counsel), for relator.

*John J. Speed (J. W. Champlin, F. A. Baker,* and *Benton Hanchett,* of counsel), for respondent.

[The points of the several counsel, and the authorities, are so exhaustively stated and discussed in the opinions, that their restatement is omitted.—REPORTER.]

MONTGOMERY, J. This proceeding brings before us for examination Act No. 200, Laws of 1891, being a revision of the general tax laws of the State.

It is claimed—*First,* that this purported statute, as it appears upon the statute-book, was not duly enacted; and, *second,* that the law as promulgated is in parts unconstitutional.

I. It has been repeatedly held that the Court may look beyond the engrossed bill to the legislative journals with a view to ascertaining whether the Legislature enacted the statute. This has long been a recognized power of the Court, frequently invoked. *People v. Mahaney,* 13 Mich. 492; *Attorney General v. Joy,* 55 Id. 94; *Attorney General v. Burch,* 84 Id. 408. In many of the states the courts have denied that this power rests with the judiciary, and have held that the engrossed bill, duly authenticated, is final, and cannot be impeached. This Court, while adhering to the view that the journals are open to inspection, has frequently, and particularly in the latter cases, held that every intendment is in favor

of the due enactment of the statute which has received the executive sanction, and that to overcome this legal presumption the journal must show conclusively that the statute which received the signature of the Governor was not duly passed. *Attorney General v. Burch*, 84 Mich. 408; *Hart v. McElroy*, 72 Id. 450, and cases cited.

The history of the present statute, so far as it is important to be noted, is as follows: On June 29, after the bill had been amended, it was voted "that the bill be laid on the table, and ordered printed as a supplement in to-day's journal." The bill had the file number 340, and was a substitute for House bill No. 178. A supplement to the House Journal was printed as of the date June 29, with the heading: "File No. 340. House of Representatives. Substitute for Senate Bill No. 178. (Introduced by Mr. Doremus.) Ordered printed for the use of the committee on judiciary. Lansing, June 29, 1891,"— followed by the title. The bill contained 116 sections. On June 30, Mr. Doremus moved that House substitute for Senate bill No. 178 (title No. 340) be taken from the table and placed on its immediate passage, which motion prevailed. The question being on the passage of the bill, the bill was read a third time, and pending the vote on the passage thereof, on motion of Mr. Doremus, the bill was laid on the table. On July 1, Mr. Doremus moved that House substitute bill No. 178 (file No. 340) be taken from the table and put on its immediate passage, which motion prevailed. Numerous amendments were then made to the bill, and after such amendments the bill duly passed the House, which was the final action taken by the House on the bill. If it be the fact that the bill as printed was the bill with which the House was dealing on July 1, it is entirely clear that the bill as it passed the House is not the bill engrossed and signed by

the Governor, as it appears that the bill as printed contains numerous entire sections which were not eliminated by amendment, but which do not appear in the law as signed, while the engrossed bill contains numerous provisions which are not contained in the printed bill as it would stand amended by incorporating the amendments made on July 1.

It is claimed, however, that the journal itself furnishes on its face evidence that after the bill in question was printed in the journal the House dealt, not with the printed bill, but with some other instrument, and that it is fairly to be inferred from what appears on the face of the journal that there were errors in the printing of the bill which the House discovered, and which led to the abandonment of the printed copy appearing in the journal.   These evidences are as follows:

1. It appears that the House took up the bill by its title and reference as printed in the journal, and before taking action on it laid it on the table, and that, when the bill was again taken up, it was referred to, not as a substitute for Senate bill 178, but as a substitute for House bill 178, which it really was.

2. The amendments offered from time to time do not correspond with the bill as printed.   As, for instance, one amendment offered was by inserting in line 1 of section 33, after the word "time," the words "or upon any mortgage or other obligation taxed as an interest in lands owned by such person as provided by this act." Not only does it appear by section 33 as printed that the word "time" does not appear in line 1, but it further appears that there is no provision in section 33 to which the proposed amendment is in any way germane.   Without tracing all the instances through, it appears beyond cavil that the amendments could not

have been offered with reference to the printed copy.

3. The bill as printed had its sections numbered consecutively, and was not after being printed considered at all in committee of the whole; and yet we find on July 1 the following in the journal:

"Mr. Doremus stated that certain sections of the bill had been stricken out and some added in the committee of the whole, which, with the above amendments, would not leave the sections in consecutive order; and thereupon Mr. Doremus further moved to amend the bill by directing the engrossing and enrolling committee to renumber the sections of the bill so that they should be numbered, as near as may be, by consecutive numbers; which motion prevailed, and the sections of the bill were thereupon accordingly renumbered."

This action of the House makes it entirely clear, not only that the House was not dealing with the bill as printed in the journal, but also that it was not dealing with an exact copy of the same. It appears, however, that this last-quoted section does not appear in the House Journal as it was printed from day to day; and it is suggested, therefore, that this must be disregarded. But it does appear in the bound volume published by authority and certified by the clerk of the House. The daily journal, as printed, is subject to amendment. Are we at liberty to infer that this emendation is a forgery? It seems to me that the case of *Attorney General v. Burch,* 84 Mich. 408, furnishes a decisive answer to this question. In that case the journal as printed from day to day, and as printed in the bound volume, showed the following:

"Mr. Wesselius moved to reconsider the vote by which the Senate passed the bill, which motion prevailed. The question being on the passage of the bill, on motion of Mr. Wesselius, the bill was ordered returned to the House."

At the close of the Senate Journal, and preceding the

certificate of the secretary, which bore date July 3, 1889, is a page headed:

"*Errata* in the Record of Bills. * * * On page 811, lines ten and eleven, the vote reconsidered was not the passage of the bill, but the vote by which the Senate concurred in the House amendments to the bill on page 797."

The Court say:

"It does not affirmatively appear at what time the secretary made this correction of the record, but it is to be presumed, from the place where the *errata* is found, that he made it on or before the date of his certificate, July 3, 1889, as the certificate follows the correction. The Legislature adjourned *sine die* upon that date; and, as every intendment is to be taken in favor of the correctness of legislative action, it must also be presumed that the correction was made before the adjournment of the Senate. If it was done, as we must presume that it was, before the final adjournment of the Legislature, we must also presume that it was authorized by the Senate, and that the true journal entry of the proceedings is as corrected by the '*errata*.'"

So in the case of the law under consideration. The House adjourned July 3, 1891. The certificate of the clerk bears date July 3, 1891, and as the correction to the daily journal as originally printed appears before his certificate, and indeed as of a prior date, we must presume that it was made before the final adjournment of the Legislature, and we. must also presume that it was authorized by the house.

In *McCulloch v. State*, 11 Ind. 424, the court, in speaking of such records, said:

"This journal must be held conclusive evidence of the facts which appear on its face, because it must be presumed that the *members as a body inspected it and made all necessary corrections before they allowed it to assume the character of a journal of their proceedings.* As well might evidence be received to contradict a statute to show that it contained certain provisions inserted through

mistake as to contradict an entry made upon the journal. The house keeping the journal is the only tribunal by which it can be corrected, and, until corrected by such authority, it must be considered conclusive as to the facts which it contains."

In the case of *Turley v. Logan Co.*, 17 Ill. 151, it was held that the journals must show that the constitutional requirements have been observed; but in that case the journals having been produced, and it appearing from the minutes of the clerk that the same legislature had corrected their journals at a subsequent session so as to conform to the constitutional requirements, this was held to be sufficient, and the law was sustained.

In *Post v. Supervisors*, 105 U. S. 670, it was said:

"By virtue of the statute of Illinois of February 12, 1849, the copies of the original daily journals kept by the clerks of the two houses, made by persons contracted with or employed for the purpose, as authorized and directed by that act (though not sworn public officers), in well-bound books furnished by the secretary of state, pursuant to the duty thereby imposed upon him, and afterwards deposited and kept in his office, are official records in his custody, copies of which, certified by him, are admissible, upon settled rules of evidence, as well as by the decision of the supreme court of Illinois in *Miller v. Goodwin*, 70 Ill. 659; and neither the competency nor the effect of such copies is impaired by the loss or destruction of the daily journals or minutes."

In *Attorney General v. Rice*, 64 Mich. 385, Mr. Justice Morse uses the following language:

"Are these journals kept by the clerk of each house, and read and corrected each day by each body, and duly certified by the proper officers to be correct, to stand as conclusive evidence of their proceedings, or are they liable to be disputed and overthrown by parol testimony, either of individual officers and members, or of strangers, who may be interested in nullifying legislative action? It would seem that there can be but one answer. The legislative record must prevail. Any other ruling would necessarily lead to dangerous and alarming results."

Without passing upon the effect of a mere omission of parts of the journal as printed from day to day from the bound journal, I think it is entirely clear that, as such journal is always subject to amendment by the House itself, both on the authority of *Attorney General v. Burch*, and the other cases above cited, and on principle, we are bound by an amendment appearing in the bound volume.

Some of my brethren are of the opinion that the supplement referred to · cannot be treated as a part of the journal; that, as there is no requirement that bills shall be printed in the journal, the order entered on June 29 for the printing of the bill in question should have been construed as having been made for the convenience of the members, and not with the intent that the bill when printed should become a part of the journal. While not assenting to this view, I think ·it is clear that, if it be treated as a part of the journal, yet, for the reasons stated, it is not possible to say that the bill with which the House was dealing was the one printed in the supplement.

Attention has been directed to an unbound portion of the journal, with paging corresponding to that in the bound volume, and it is suggested that this demonstrates that the statement purporting to have been made by Mr. Doremus was inserted after the Legislature adjourned. But as well might it be said that the printer's proof-sheet, before correction, is more authentic than the corrected publication. No such view can be adopted, unless we reverse the usual doctrine in such cases, and start out with the presumption that the clerk of the House has falsified instead of correctly certifying the record. This I am not prepared to do.

II. It is claimed that so much of the statute as provides for the taxation of the mortgage interest in lands,

and points out the method of collection, is unconstitutional, for various reasons.

The provisions of the law, so far as necessary to be noted, are as follows:

"SECTION 2. Any real-estate mortgage, deed of trust,. contract, or other obligation, by which a debt is secured, when land within this State is pledged,   *   *   *` shall, for the purpose of assessment and taxation, be deemed and treated as an interest in the land so pledged."

Section 17 provides that "the value of the property affected by such mortgage,   *   *   .  *   less the value of such security, shall be assessed and taxed to the owner of the property, and the value of such security shall be assessed and taxed to the owner thereof."

Section 15 provides that in making the assessment roll the value of the interest in such real estate represented by a mortgage, deed of trust, or other obligation shall be set opposite the name of the owner, and the value of the interest of the owner of the fee, less the value of the mortgage or other interest, shall be set down opposite the names of the owner and occupant.

Section 17 further provides that the taxes so levied shall be a lien upon the property and security, and may be paid by either party to such security. If paid by the mortgagor or holder of the real property, such portion as was assessed to the mortgagee shall be considered and. treated as payment on any interest that may be due, or,. if there is no interest due, then as payment of so much of the principal. If paid by the mortgagee or holder of the security, such portion as was assessed to the mortgagor or owner of the fee shall become a lien upon the land, and be added to all other obligations. It is further provided that neither the mortgagee nor the mortgagor shall be at liberty to pay so much of the tax as is assessed against the other until the warrant has been in the hands of the collector 30 days; thus affording the party assessed the opportunity himself to pay the tax in the first instance.

1. The first criticism passed upon these provisions is that the law requires the mortgagor to pay the mortgagee's tax. But it should not be overlooked that the statute contemplates an assessment of the entire interests

in the land, both that of the mortgagor and mortgagee, —by separate assessments, it is true, but still an assessment of the entire interests. It cannot be doubted that it is entirely competent for the Legislature to cause this entire value to be assessed to the mortgagor. This has been the law of Michigan for many years. This act, then, is in relief of the mortgagor, and it cannot be held to be invalid because it relieves him only on condition that the owner of the mortgage interest shall, within a stated time, pay the tax.

2. It is said that the mortgagor would have no right under the law to appear before the board of review to ask for a correction of the assessment of the mortgage interest. But I do not so read the statute. Section 20 provides that the board, "at the request of any person whose property is assessed, * * * and on sufficient cause being shown, shall correct the assessment as to such property." The owner of the fee can under this provision be heard as to the amount of both the mortgage interest and his own; for the assessment of the mortgage interest is to be deducted from his own, and, if the mortgage interest be too small, his own assessment is too large; if the mortgage interest is assessed at too high a figure, his assessment will be too low, and he would have the right to have it increased.

3. It is next suggested that, where the interest of the mortgagee is assessed and remains unpaid, a sale is made of a fee-simple, and the deed conveys an absolute title; and while it is conceded that it may be competent for the Legislature to provide for the sale of the fee under the assessment of the mortgagee's interest, yet it is claimed the law is defective in not pointing out how the two interests sold are to be distinguished, if the mortgagor and mortgagee fail to pay their respective taxes. It is said, if the fee-simple is sold, the mortgagor will lose

his land, although he may have paid his own tax. I have already pointed out that the mortgagor will, as under former statutes, be bound to pay the entire tax on the value of the property, subject only to the relief afforded him if the tax assessed against the mortgage interest shall be paid by such mortgagee; and, while I quite agree with respondent's counsel that the Legislature intended a fee to be sold, I think that the provis on of section 62, that "no greater interest in [portion of] any parcel shall be sold than is sufficient to pay the amount of the tax on which the same is sold," is sufficient protection to both mortgagor and mortgagee. The land is by the provisions of this law, as under the former statute, made subject to the entire tax assessed on its full value. The mortgagor or mortgagee can either prevent a sale by the payment of the tax.

4. It is next claimed that the provision that the mortgagor may pay the tax assessed against the mortgage interest in case of the mortgagee's default, and deduct the same from the amount owing on the mortgage, impairs the obligation of contracts. But in my judgment this view is not tenable. The contract between the mortgagor and mortgagee remains the same. The mortgagee may and should pay the tax, and if he fails to do so the State appropriates so much of the fund which the mortgage represents—so much of the mortgagee's estate in the land—as is necessary to pay the tax. It is true, the State interposes between the mortgagee and the mortgagor, and excuses the latter from making a payment to the former which, by the terms of his contract, he would otherwise be bound to make; but this is not because of any interference with contract relations, or by virtue of any abrogation of the contract rights of the mortgagee. It is because the State has attached or seized so much of the mortgage debt before it has reached

the mortgagee. The cases are numerous in which a law providing that agents of a corporation might withhold,. from the party entitled to the same, so much of declared dividends as shall be necessary to satisfy taxes imposed by the state, has been upheld. Cooley, Tax'n, 299, and cases cited. These cases are entirely analogous.

The case of *Robertson v. Land Commissioner*, 44 Mich. 274, does not conflict with these views. What was held in that case, in effect, was that authorizing the one party to the contract to refuse performance until evidence should be produced of the payment of the tax was in the nature of a penalty, and not a means of collecting the tax directly. But the Court say:

"It must no doubt be admitted that the State may provide modes for collecting its revenues that will seem harsh, unreasonable, and arbitrary. Some such are to be found in the laws of Congress, as well as in the legislation of the states. The judiciary would not venture to indicate limits to the power of the sovereign in this regard, so long as its laws were general and impartial."

5. It is further suggested that as, in certain cases, a portion of the principal debt secured by the mortgage is appropriated, it interferes with the contract obligation of the mortgagor to pay interest upon this sum, and to that extent, at least, is an impairment of the contract. But it is equally true that if the money was paid by the mortgagee in hand, or was seized by the tax collector, he could not thereafter receive interest on the fund. This would be no hardship. If he refuses to pay the tax, the State appropriates so much of the fund within its control to that purpose. It no more interferes with his contract relation with the mortgagor than would the seizure of personal property in the hands of a bailee by a taxing officer interfere with the contract existing between the bailor and the bailee. In such cases, doubtless, the bailee would be relieved from his agreement to return

the property, just as under this law the mortgagor is relieved from the payment of so much of his debt as is thus appropriated by the State.

6. It is strenuously insisted that the provision which makes the mortgagor liable for the tax assessed against the mortgagee is unconstitutional; and it is said that it is not within the constitutional power of the Legislature to compel one man to pay another man's debt,—a proposition safe enough in itself, but not conclusive as to the right to provide that the mortgagor or occupant of lands shall be liable for the tax on such lands. It is not necessary to go to the length to which the majority of the Court went in *Sears v. Cottrell*, 5 Mich. 251, in order to sustain this provision. The relation of the owner of the fee to the property is such that the right to assess the whole property to him is undoubted, and to my mind it would be an unsound doctrine, resting upon shadow rather than substance, which would deny the power of the Legislature to relieve him conditionally, on the pretense that by so doing his constitutional rights are being infringed.

7. It is, again, urged that the law is unconstitutional, in so far as it attempts to tax mortgages owned by non-residents, for the reason that the mortgage is personal property and a mere security for a debt, and is of that character of personal property which must be held to attach to the person, and to have no other *situs* for any purpose; and the case of *State Tax on Foreign-Held Bonds*, 15 Wall. 300, is cited in support of this contention. It is further said in support of that position that in Michigan a mortgage is a mere incident to the debt, and conveys no title to the land. *Caruthers v. Humphrey*, 12 Mich. 270; *Ladue v. Railroad Co.*, 13 Id. 380; *Wagar v. Stone*, 36 Id. 364. And it is urged that, as this is so, the taxation of such mortgage interest amounts to a taxation of

the debt, and brings the case within the case of *State Tax on Foreign-Held Bonds*. But while it is true that the mortgage is a mere security for the debt, yet it conveys a qualified property in the land; while it is not an estate which entitles the mortgagee to possession before foreclosure, it is nevertheless an estate or interest in lands, which is protected by our registration laws as fully as any other title or interest. It is held that the mortgage interest so far partakes of the character of real property as to require administration in the state of its location, and that neither a foreign administrator nor his assignee can maintain an action to foreclose a mortgage in the state where the mortgaged property is situated. *Cutter v. Davenport*, 1 Pick. 81; *Dial v. Gary*, 14 S. C. 573; and the opinion of COOLEY, J., in *Reynolds v. McMullen*, 55 Mich. 568. It has also been held that the legislature may select as the *situs* of the taxation of mortgages either the political division where the owner resides, or that in which the mortgaged premises are situated. *State v. Runyon*, 41 N. J. Law, 105; *Mumford v. Sewall*, 11 Or. 70 (4 Pac. Rep. 586). See, also, *Insurance Co. v. Com.*, 137 Mass. 81; *Bank v. Boston*, 101 Id. 575.

The case of *State Tax on Foreign-Held Bonds* is apparently in conflict with these cases. The doctrine of that case was announced by a bare majority of the court, and ought not to be treated as binding authority, except as to the precise questions before the court. The law which the court had under consideration provided that—

"The president, treasurer, or cashier of every company, except banks or savings institutions, incorporated under the laws of this commonwealth, doing business in this state, which pays interest to its bondholders or other creditors, shall, before the payment of the same, retain from said bondholders or creditors a tax of five per centum upon every dollar of interest paid as aforesaid."

In the opinion of the majority of the court, Mr.

Justice Field states the question before the court as follows:

"The question presented in this case for our determination is whether the eleventh section of the act of Pennsylvania of May, 1868, so far as it applies to the interest on bonds of the railroad company made and payable out of the state, issued to and held by non-residents of the state, citizens of other states, is a valid and constitutional exercise of the taxing power of the state, or whether it is an interference, under the name of a tax, with the obligation of the contracts between the non-resident bondholders and the corporation."

It will be seen that the court was not dealing with a statute which in terms imposed a tax upon a mortgage interest in lands. This statute was a clear attempt to tax credits distinctively as such, and applied alike to bonds secured by mortgages, and to those which were not so secured. In that respect it is distinguishable from the statute of Michigan, as our statute, in all its provisions relating to the subject, imposes a tax upon an interest in real estate as such. It seems to me that the case is not given any added force as authority here by the fact that the particular bonds in question were secured by mortgage, *for the attempt was not to tax the mortgage interest in lands*, but to impose a tax upon *the bond itself*, which the court held to have a *situs* at the domicile of its owner.

So in *Latrobe v. Baltimore*, 19 Md. 20, it was held that the *situs* of the mortgage was the domicile of the owner, and that such owner could not be taxed where the property covered by it was located. But in the opinion it is said:

"We are not aware that the acts of the assembly regulating the imposition and collection of taxes have effected any modification of the rules of law which otherwise must govern the determination of this question."

So it will be seen that the question of the power of

the legislature to fix the *situs* for the purpose of taxation at the place of the location of the property mortgaged is not touched upon. We think it was competent for the Legislature to treat real-estate mortgages as an interest in lands for the purpose of taxation, and that, even though held by non-residents, they may be given a *situs* in the place where the mortgaged property is situated. This the act in question purports to do, and should be sustained.

8. The question is presented whether the mortgages held by savings banks and insurance companies are to be treated as real estate, and deducted from the amount of capital stock, or whether the tax on mortgages is over and above the tax on capital.

The law provides for the assessment as personal property of "all shares in banks organized in this State under any law of this State or of the United States at their cash value, after deducting the value of the real estate taxed to the banks." As to insurance companies, it is provided that, "in computing the taxable property of insurance companies organized under the laws of this State, the value of the real property on which a company pays taxes shall be deducted from its net assets above liabilities," as ascertained at the last report.

I think the intent is clear to treat mortgages as real estate, and that the interest in real estate so taxed to banks and insurance companies may be deducted from the shares of stock as assessed. See *Insurance Co. v. Com.*, 137 Mass. 80. It is said that the amount of mortgages held by savings banks in many cases greatly exceeds the capital stock, so, if the amount for which such mortgages are assessed is deducted, there will be no tax on their shares; and this state of things is urged as a reason why the Legislature could not have intended to tax mortgages held by these institutions. But, on the

other hand, it must have been known to the Legislature that the exemption of the mortgages held by such corporations from the burdens imposed upon like securities in the hands of individuals would give to such banks a practical monopoly of the business of loaning money on mortgages in this State. This is a result so manifestly unjust that it would not be inferred unless such a construction of the statute is made necessary by its plain provisions. This, I think, is not the case here.

It is also contended that, if the statute be construed so as to admit of taxation of mortgages of savings banks as real property, the result is double taxation in many cases, inasmuch as the mortgages represent deposits, and the depositors are required to pay a tax. I do not think this amounts to double taxation, in any objectionable sense. If the banks hold property subject to taxation in excess of their actual capital, the case is no harder for them than it is in the case of any individual taxed for the value of the property owned by him, though he may at the time be indebted to the amount of nearly or quite its full value. In Cooley on Taxation (page 160) it is said:

"Now, whether there is injustice in the taxation in every instance in which it can be shown that an individual who has been directly taxed his due proportion is also compelled indirectly to contribute, is a question we have no occasion to discuss. It is sufficient for our purposes to show that the decisions are nearly, if not quite, unanimous in holding that taxation is not invalid because of any such unequal results. It cannot be too distinctly borne in mind that any possible system of tax legislation must inevitably produce unequal and unjust results in individual instances; and, if inequality in result must defeat the general law, then taxation becomes impossible, and governments must fall back upon arbitrary exactions."

It is not within the power of this Court, as I under-

stand it, to declare that the Legislature, in enacting a statute, has exceeded its constitutional authority, except in a case where it clearly appears, by a comparison of the terms of the statute with the Constitution itself, that some provision of the fundamental law has been violated. I do not assert that the Court may not construe the Constitution as well as the statute, or that we may not hold that what is by clear implication inhibited is beyond legislative power; but in my opinion this fixes the extreme limit of judicial control over the legislative department. The pernicious notion that courts may scrutinize legislation with a view to ascertaining how far it accords with some uncertain, shadowy spirit of our institutions, when such spirit is not expressed in our Constitution, cannot be too early or too definitely or too absolutely denied. *Robinson v. The Red Jacket*, 1 Mich. 171; *Green v. Graves*, 1 Doug. 351; *People v. Mahaney*, 13 Mich. 481; *Attorney General v. Preston*, 56 Id. 177; opinion of COOLEY, C. J., in *State Tax Law Cases*, 54 Id. 446.

9. It is suggested that, where lands covered by mortgage lie in two or more taxing districts, it will be impossible to properly apportion the tax. I do not consider that there will in many cases be such difficulty. The mortgage being treated as an interest in lands, the proportion which is properly taxable in each district will be that proportion which the land lying in such district bears to the whole; and, when the taxing officer can inform himself as to these values, there is no reason why he cannot properly make the assessment. There may be instances where this will not be possible, but it is a difficulty which will not often occur. There must be, are, and always will be difficulties in the way of taxing all the property that ought to bear the burdens of taxation; but this cannot obstruct taxation altogether, or even tax-

ation upon any species of property. And this defect, where it exists, is not beyond remedy by subsequent legislation; and the difficulties under the present law will be found insurmountable only in a few extreme cases. In my opinion, such a defect ought not to invalidate the whole scheme involved in the provisions relating to taxing mortgages. *Attorney General v. Detroit,* 29 Mich. 108; *Robison v. Miner,* 68 Id. 549.

10. The question has been suggested as to whether the statute is to be so construed as to relieve mortgagors from the obligation of paying the tax in cases where there were agreements on their part to do so, in force at the time when the law took effect; and also as to whether it is competent for the mortgagor to engage to pay the taxes which may be assessed against the mortgagee's interest in the lands, in addition to paying the full legal rate of interest allowed by statute. The first question would of necessity depend upon the terms of the contract; but it is clear, both on reason and authority, that, if the engagement of the mortgagor is sufficiently broad to cover any assessment which may be made on all interests in the land mortgaged, his undertaking is in no way interfered with or abridged by the present statute. *Hammond v. Lovell,* 136 Mass. 185. Nor is there any obstacle, either in Act 200 or in the usury law (Act No. 156), to an agreement by the mortgagor to pay all taxes which may in the future be assessed against all interests in real property owned by such mortgagor, including the interest granted to the mortgagee. Such an agreement does not amount to a reservation of interest, but is in the nature of an agreement to preserve the estate which constitutes the security, and is no more unlawful than an agreement to keep the property insured with a similar purpose. See *Banks v. McClellan,* 24 Md.

91 MICH.—7.

62. That it was not the purpose of the Legislature to limit the power of parties to contract as they may choose in this regard is made clear by the fact that a clause of the tax law, as originally drafted, prohibiting such contracts, was struck out by amendment before its final passage.

I thing the *mandamus* should issue as prayed, commanding the board of assessors—

1. To assess the value of any land contract to the owner of such security as real estate.

2. To assess as real estate, to the owner thereof, the value of any real-estate mortgage executed either before or after the law of 1891 took effect, and whether held by residents or non-residents of this State.

3. To assess to savings banks or insurance companies, as real estate, the value of any real-estate mortgages owned by such banks or insurance companies, and to deduct the value of all real-estate mortgages owned by any savings banks or insurance companies from the value of the capital stock of such banks as determined for assessment purposes.

McGRATH, J., concurred with MONTGOMERY, J.

MORSE, C. J. There is no better settled rule of law in this State than that, in the investigation of a question whether a law has been properly and constitutionally passed by the Legislature, every presumption and intendment are strongly in favor of its due enactment; and if the journals are resorted to, the law can only fail where it *conclusively* appears from such journals that constitutional methods were lacking in its passage.

In the law before us, we have:

*First.* The law published in the Public Acts, which are made presumptive proof that the laws therein con-

tained were duly enacted, and which are received as such without further evidence of their authenticity than they bear upon their face.

*Second.* We find in the office of the Secretary of State, where it is provided it shall be kept, the duly enrolled and engrossed manuscript act, signed by the speaker of the House, the president of the Senate, and the Governor. This engrossed act agrees entirely with the published law. Here we have, again, another strong presumption in support of the proper passage of the act, which we thus find enrolled and certified by the proper officers.

*Third.* We now go to the journals of both houses, published by authority of law and certified to be correct by the proper officers, and the only journals that the Constitution or laws prescribe shall be kept and preserved as journals of the Legislature, and find nothing in such official journals militating against the proper and constitutional passage of the act in question. These journals are also presumed to be correct, and it is doubtful if they could be overthrown by parol proof.

*Fourth.* This bill was read section by section, at length, just before its passage. It is to be presumed that the Legislature knew what was being voted upon.

*Fifth.* It was reported to the House as correctly enrolled and engrossed, and the presumption is that it was.

*Sixth.* Fortunately, although not required by law to be preserved, the original bill itself, as passed, with its erasures, amendments, and riders, is found in the office of the Secretary of State, and upon examination is found to be identically the same as the published law.

This bill could not be resorted to in order, by its discrepancies, if any there were, to defeat the law, yet it establishes the fact that there is no difference between

the law as published and the act as passed. I refer to it simply to show how easily, by reasoning from false premises and using all presumptions against the validity of the act, it is apparently *conclusively* shown that a falsehood is the truth. For instance, in this case, assuming that the so-called "supplement" presented to us upon the last argument is a part of the journal, and further assuming that the bill was correctly printed therein as of the condition it was in when the motion to print the supplement was carried, and then, again, assuming that this bill as printed in such supplement was the bill thereafter acted upon, amended, and passed by the two houses, it is made *conclusively* to appear that the law as published is not the act passed by the Legislature, but a radically different one; having, as shown by the opinion of Mr. Justice McGRATH, 13 sections not found in the supplement, nor put there by subsequent amendment, and the supplement having 8 sections not found in the law, nor eliminated from said supplement by amendment. Yet the bill in the Secretary's office, the one handled and preserved by the clerk of the House, and to which all amendments were attached in its progress, is the identical law as published; and the only suspicion resting upon it is that one clause erased therein has written upon its margin the words, "Richardson says this is stricken." When this writing was done does not appear, but the presumption must be that it was done before the passage of the act. The trouble with the argument against the constitutionality of the passage of this act is that it abounds in presumptions against the regularity of the proceedings, when the law holds that all presumptions must be strongly the other way. Without these false presumptions, there is no standing for an argument against the validity of the passage of this law.

1. This supplement has no place in the journals except by false presumptions. It was not made a part of the journals by those authorized to publish and certify to their correctness. It must be presumed that the journals were corrected and approved, as certified by the clerk of the House and secretary of the Senate, before the Legislature adjourned, and the certificates attached to the same on the last day of the session, as shown by such certificates. *Attorney General v. Burch*, 84 Mich. 408. This supplement is not the only one ordered published by the House. There were two others, to wit:

Senate substitute bill No. 64 (file No. 464), the general election law. "On motion of Mr. Diekema the bill was ordered printed as a supplement to to-day's journal." House Jour. 2143.

And House bill No. 538 (file No. 269) charter of the city of Detroit. "The bill was then ordered printed as a supplement to the journal, referred to the committee of the whole, and placed on the general order." House Jour. 2031.

Neither of these supplements is found in the published volumes of the House Journals. This effectually disposes of the claim that the supplement of June 29 was left out of the published journals for fraudulent purposes, and also establishes the fact that, under legislative practice, these supplements are not considered as parts of the journal, but that they are the mere printing of bills for the convenience of the members, and can be no more used to stultify or contradict the journals than can any other printed copy of a bill laid upon the desks of members, and used by them for reference during the session. The natural as well as the legal presumption is that these supplements were printed, as other bills are printed, for the convenience and use of the members, and that it was not the intention of the Legislature to make them a part of the journals. This natural and

legal presumption accords with the fact as to legislative
practice, as shown above; and any presumption to the
contrary is not only a forced and illegal one, but con-
trary to the truth, as shown by the custom of the Leg-
islature since the Constitution of 1850.  No such things
as a supplement to the journal has ever yet found its
way into the legislative journals, and probably never will,
unless inserted by this Court.   To enforce the argument
against the law, this legal and natural presumption is
disregarded, and the custom of the Legislature ignored,
in order to declare this supplement a part of the journal;
and the clerk of the House is also presumed to have dis-
regarded his duty, and committed a fraud or grave mis-
take, in leaving it out of the corrected and printed
journals.   Other presumptions are also necessary, to wit,
that the supplement presented to us is the supplement
ordered printed June 29, with the further presumption
that it was laid upon the desks of the members of the
House the next morning, and with still another presump-
tion, that it was correctly printed.   Every step taken
in the argument must necessarily be based upon presump-
tions, which are unlawful under our previous holdings.

There is no law providing that the Secretary of State
shall file or keep copies of the daily journals, as they
are published from day to day, in his office, and none
are kept there.   The law provides only for printed and
bound volumes to be preserved.  How. Stat. § 15.  The
supplement presented to us was found in the files of
legislative journals kept by one Frank A. Potter, chief
clerk in the office of the Secretary of State.   It also
appears that no files of the legislative journals have here-
tofore been kept in said office for all these years, and
that there are no files there at the present time, except
such as are the personal property of clerks in the office.
It is also shown by a resolution of the Legislature that

copies of the daily journal were mailed and distributed to the people entitled to them, outside of the Legislature, directly from the State printer, and that such copies were never before either house of the Legislature. This supplement found in Potter's file had no place even in that file with the journal of the 29th, but was found at the end of the legislative daily journals with other supplements and miscellaneous documents.

If this supplement can be used here, then any other purported supplement, or any paper purporting on its face to be a portion or a part of the printed daily journals of the Legislature, can be brought into court at any time to dispute and impeach the authenticity of the official journals published and bound by the State printer by authority of the Legislature, and certified to be correct by the clerk of the House and the secretary of the Senate. It will not be necessary, under the reasoning of the argument in favor of this supplement, to inquire where the paper came from. It will be *conclusively presumed* that it is an exact copy of those that it will also be presumed were laid upon the desks of the members of the Legislature; and whether picked up in the street, or found in the files preserved by some one, by whom it was received in the mails, it will, by presumptions never before indulged in in favor of any document, and without proof, because no proof can be received, stand in the courts as the journal of the Legislature for the day or days it purports to cover, and, if it conflicts with the published journals, the latter must fall. It is to be hoped that no such dangerous precedent as this will ever be established by this Court.

As for myself, from the beginning, I have regarded this supplement—as the Legislature evidently regarded it—as no part of the journals; and a. patient and laborious investigation of the journals in connection with it,

and treating it as a part of such journals, has, as conclusively shown by the opinions of my Brothers McGRATH and MONTGOMERY, proven that the Legislature, in their action upon the bill before them, paid no attention to it, and utterly disregarded it. To now make it a part of the journal, and to impeach and destroy legislative action by virtue of it, would be a usurpation by this Court of power which belongs to the Legislature, under our Constitution, and would be a declaration of law which, in this case, would evidently lead to a false determination, and a denial of the truth as to the action of the Legislature in the passage of the law before us.

This case is not at all like the case of *Rode v. Phelps,* 80 Mich. 598. In that case the bill under consideration was found printed in the body of the journal as it came from the Senate. "The bill as amended was ordered printed at length in the journal. The bill is as follows:" (Then follows the bill in full.) See House Jour. 1889, p. 1792. Every subsequent alteration of the bill as printed appears upon the journals, and it was never read again in the House, and it was finally passed by a concurrence in the report of the conference committee of the two houses. No presumptions were indulged in in that case, because everything appeared plainly and conclusively in the official journals, and there was no possible escape from the fact that the bill, as signed by the Governor, never passed either house of the Legislature.

2. As to the law itself, I think it valid, as shown by the opinion of Mr. Justice MONTGOMERY, in which I concur.

The writ must issue as prayed.

McGRATH, J. I concur in the views expressed by Mr. Justice MONTGOMERY as to the constitutionality of the act in question. · ·   .

Respecting the enactment of the law, I do not regard

it as important whether the supplement referred to is or is not to be treated as a part of the House Journal. If regarded as a part of the journal, in the absence of anything upon the face of the journal pointing away from that print of the bill, the presumption would be that it was the print acted upon; but if it affirmatively appears from the journal that the action of the House was not aimed at that print, but was directed to some other print, the supplement print has no more weight than any other print ordered by the House, whether printed in the journal or elsewhere, for the convenience of the House.

The bill was originally ordered printed for the use of the committee. House Jour. 1246. The committee reported a substitute on June 19, which was also printed for the use of the House. Id. 2050. This print was known as "Substituted for House Bill No. 178 (File No. 340)." On June 29, after it was again reported, it was ordered printed as a supplement to the journal. Hence, we have three distinct prints of the pending bill, two of which were presumably in the usual form of printed bills, with numbered lines and wide spaces between the lines, and the other printed in double columns on daily journal size paper, without numbering of lines, and with ordinary spacing. On June 29, "Mr. Doremus moved that the bill be laid on the table, and ordered printed as a supplement in to-day's journal." Prior to this time the several prints of the bill had been considered in committee, reported with amendments, and had been considered in committee of the whole. In the supplement the print was entitled, "Substitute for Senate Bill No. 178." On June 30, "Mr. Doremus moved that House substitute for Senate bill No. 178, entitled," etc., be taken from the table, and on motion by same party said bill was again laid upon the table. It is significant that in this

instance Mr. Doremus, who had charge of this legislation, referred to this print as "House substitute for Senate bill No. 178," and that in no other instance is there any evidence upon the journal that this print was again before the House. It is significant, too, that at this time this bill was read *a third time,* and that subsequently, on July 1, the bill then taken up and passed was also read "a third time."

On July 1, on motion of Mr. Doremus, House substitute bill No. 178 (file No. 340), was taken from the table and put upon its passage. A large number of amendments were offered by Messrs. Doremus, Dafoe, Connor, and Richardson:

1. To strike out of line 9 of section 11 the words "to hire," and insert, etc. Line 9 of section 11 of the supplement print is as follows: "Procuring any such property to be manufactured upon contract shall be."

2. By adding to section 11, line 33, after the word "assessment," the words, etc. Line 33 of section 11 reads thus: "Any shed, shall not be deemed in transit, but shall be assessed to the."

3. To insert in line 12 of section 15, after the word "properly," the words, etc. Line 12 of section 15 reads as follows: "The quantity of land comprised in any town, city, or village."

4. To insert in line 1 of section 33, after the word "time," the words, etc., and to insert in line 10 of section 33, after the word "necessary," the words, etc. There is no such word as "time" in the first 10 lines of section 33, and no such word as "necessary" in the tenth line.

5. To strike out of line 40 of section 34 the word "assessment," and insert, etc. Line 40 of section 34 reads: "Collected as hereinafter provided, and shall give his receipt therefor. The."

6. To strike out of line 5 of section 38 the word "a;" but line 5 of section 38 contains no such word.

7. To strike out of lines 8 and 9 of section 38 certain words; but the words do not occur in lines 8 and 9, and do occur in lines 9 and 10.

8. To insert in line 18 of section 40, after the word "lien," certain words; but the word "lien" does not occur in line 18, but does occur in line 20.

9. To insert in line 7 of section 48, after the words "and the;" but no such words are contained in line 7.

10. To insert in line 3 of section 48, after the words "State and;" but line 3 has no such words.

11. To strike out all of section 48 between the words "each year" in line 15; but line 15 contains no such words.

12. To insert in line 17 of section 55, after the words "sold for the," etc.; but line 17 of section 55 contains no such words.

13. To strike out of line 21 of section 60 the words "Auditor General," and insert, etc.; but the words "Auditor General" do not occur in line 21 of section 60.

14. To strike out of section 71, commencing with the word "shall," in line 5, etc.; but the part stricken out commences in line 6.

15. To strike out lines 9 to 23, inclusive, of section 71; but the part actually stricken out includes 14 other lines which appear in the supplement. The journal strikes out 15 lines, whereas 39 lines, as they appear in the supplement, were actually stricken out.

It does not appear that the bill was considered in committee or in committee of the whole after it was ordered printed in the supplement. The California mortgage tax system, and the county system for the collection of delinquent taxes, refer to provisions which at the time were already incorporated in the bill, as indicated by the resolutions themselves. House Jour. 2167, 2168. The supplement print, however, contains sections 43, 44, 64, 65, 66, 67, 68, and 69, which do not appear in the law as published, and sections 20, 21, 51, 63, 67, 74, 75, 76a, 78, 79, 81a, 81b, and 82, contained in the law, do not appear in the supplemental print; and nowhere does the journal, after the print was ordered in the supplement to the journal on June 29, refer to any amendment striking out either of the sections 43 to 69 above named, or to the incorporation of sections 20 to 82, inclusive, above

named, either by number or matter; nor does the journal, after the supplemental print was ordered, contain any intimation that the bill was referred to or reported by any committee, or that it was considered in committee of the whole. The journal does show, however, that at the same morning session at which the amendments referred to were adopted the bill was read the third time as amended, and passed (House Jour. 2203); that it went to the Senate, and was there passed with amendments, and the amendments were afterwards concurred in by the House (Id. 2242, 2243); and that afterwards the committee on engrossment and enrollment reported as correctly enrolled, signed, and presented to the Governor, House bill No. 178 (file No. '340), being an act, etc. (House Jour. 2285). The journal nowhere intimates that this print of the bill was before the House for amendment or adoption, nor does it show that a single amendment was directed to or aimed at it, but the journal conclusively shows that some one of the other prints was before the House; and, this fact appearing, it must be presumed, I submit, that it was such other print that was finally read the third time, put upon its passage, and passed.

It cannot be presumed that four different members of the House, each offering amendments, had before them this supplemental print, when every amendment that was offered refers to some other print of the bill. The supplement print contained no numbered lines. The numbered lines appeared only in the other prints of the bill, which existed before the print was ordered in the supplement to the journal. If either of the four members offering amendments had before him a copy of the bill which was being considered by the House, in which the lines were numbered, he must have had a copy previously made. If the clerk had a copy in which the lines were numbered, he too must have had a copy of

some other print. If the members had a copy in which
the lines were numbered, they too must have had a copy
of some previous print. It must be recollected that each
of the other prints, having numbered lines and wide
spaces between the lines, were, when printed, distributed
to the members, and each member of the House had
before him a file of the bills which had been ordered
printed by the House.

It will not do to say that this supplement print received
certain amendments which appear upon the journal; for
none of the 16 amendments above referred to are directed to
or aimed at the said print, and none of the other amend-
ments offered necessarily refer to said printed copy.
There is not a figure, line, or sentence in the journal of
July 1 that necessarily refers to the print contained in
the journal supplement. On the other hand, the 16
motions to amend, enumerated above, refer to some
other print which was then before the House, in the
hands of the members offering amendments, before the
clerk, and understood by the members of the House
generally. The House had the undoubted right to dis-
regard this print in the supplement. So far as we know,
it may have been incorrectly printed. Some other copy
than that intended may have been printed. The House
had a clear right to discard this print for any reason,
and to take up either of the other prints. They had
been presented, referred to the committee, reported with
amendments, and considered in committee of the whole.
No House rule or parliamentary precedent can be invoked
to defeat legislation. Every amendment offered can be
found in the act as passed in its proper place, with
the proper context. Sixteen of the amendments offered
cannot be associated with the supplemental print with-
out doing violence to the express language of the jour-
nal. If the validity of the act passed is to be tested by

this print, then the law is defective, not simply because it does not contain the clause relating to agreements for the payment of the tax by mortgagors, but for the additional reason that sections 43, 44, 64, 65, 66, 67, 68, and 69 of the supplemental print are not contained in the law, and sections 20, 21, 51, 63, 67, 74, 75, 76a, 78, 79, 81a, 81b, and 82 are contained in the law, and are not contained in the supplement. If a portion of section 17 was surreptitiously stricken out, then why have not the sections above named, from 43 to 69, inclusive, been surreptitiously eliminated, and why have not the other sections, 20 to 82, inclusive, been surreptitiously interpolated? It must be clear to every one who examines the matter carefully that the House had before it some copy of the bill, other than the bill printed in the supplement,—some copy that had been amended by the substitution of the sections appearing in the law, which do not appear in the supplement print, and by striking out, if ever in, the sections which appear in the supplement print and do not appear in the law,—some copy in which section 17 had been amended. Thus is explained every word in the act, and every word in the journal which records the action of the House.

It being clear that some copy of the bill other than the supplement print was before the House when the amendments were offered, the natural presumption is that the House kept that copy in sight, and that this is the same copy that was read a third time and passed. The committee on engrossment and enrollment report the bill "as correctly enrolled, signed, and presented to the Governor," and the Governor approves the bill so engrossed and enrolled. The passage of the act intervened between amendments and enrollment. The same theory, and the only theory, that explains the journal entries when the bill was before the House for amendment,

accounts for the bill as passed and enrolled. Any other theory renders senseless and nugatory 16 amendments which appear upon the face of the journal, emasculates both supplemental print and act, and makes a dupe of the Governor, dolts of the members of the Legislature, and knaves of the members of the committee on engrossment and enrollment, and the clerk of the House.

LONG, J. I fully concur in the views expressed in the opinion by my Brother GRANT, in which it is held that the act signed by the Governor is not the act which passed the Legislature, and is therefore void. Aside from that, conceding that the act signed is the one which passed the Legislature, as held by the majority of the Court, there are many provisions which, in my opinion, should be held unconstitutional.

The whole scheme of the act for taxing mortgages is that the owner's interest and the mortgagee's interest shall be taxed separately. Section 17 provides that—

"If the said mortgagee shall neglect or refuse to pay the tax assessed to him as the holder of any such mortgage, deed of trust, contract, or other obligation, the treasurer shall proceed to collect the same from the mortgagor or holder of the said real estate in the same manner as is provided by law for collecting other taxes; and any delinquent tax accruing by reason of the failure to collect the tax assessed upon any such mortgage, deed of trust, contract, or other obligation may be returned against the said land in the same manner as other delinquent taxes."

The act applies as well to existing mortgages as those hereafter given, and to mortgages held by non-residents as well as those held by residents.

The scheme for taxation is as follows: The assessing officer, in the first column of his roll, is to set down a description of the land. In the second column, and opposite to the description, he gives the name of the

owner or occupant, if known, and, if not known, the words "Owner unknown." He is then to assess the owner or occupant, known or unknown, the true cash value of the land, less the value of the mortgage or other interest therein. He shall also set down the name of the owner of the mortgage or other such interest, and opposite thereto the value of such interest; and the taxes to be apportioned and carried out upon the roll in accordance with such assessment.

At first blush, this would seem to be just and equitable. But let us look at the means of collection. It often happens that taxes are not paid. The mortgagee may be a non-resident and fail to pay the tax, or the mortgagor may be a non-resident and fail to pay upon his interest. If the tax is not paid, and there can be found no personal property of the owner of the land from which the tax can be collected by distress, the whole tax upon the land and upon the mortgage interest is made a lien upon the land, for which it can be sold; and thus the land of the owner is sold to pay a debt of the mortgagee. It is also provided that, if the owner of the fee has personal property, not only his portion of the tax may be collected from him, but the taxes upon the mortgage interest may also be collected from him, by distress and sale of his personal property. The tax upon the mortgage interest is not against the mortgagor, but against the mortgagee, and yet the personal property of the mortgagor may be seized and sold for such tax. It is true that the law provides that the mortgagor, upon payment of the mortgagee's tax after 30 days from the time the roll goes into the hands of the collecting officer, or upon the payment by distress and sale of the goods and chattels of the mortgagor, may have the same treated as a payment upon the interest that may be due on the mortgage, and, if no interest is due, then as a

payment upon the principal. It is also provided that, if the mortgagor's tax is paid by the mortgagee, it " shall become a lien upon the land, and be added to all other obligations, and become subject to the same terms and conditions as such mortgage," etc.

It will be seen from this that whatever the contract may be, as stipulated in the mortgage, between the mortgagor and the mortgagee, and though not a dollar is due upon the principal or interest of the mortgage, and not a dollar to become due for five years thereafter, yet the collecting officer is authorized and empowered under the act to seize for the debt of the mortgagee the last piece of personal property the mortgagor has; for there are no exemptions from seizure and sale from taxes under this act. Under certain circumstances, it is distressful enough for a man to be compelled to surrender the last article of personal property he possesses to pay his own tax; but to say that this distress may be visited upon him to pay the debt of another is not only monstrous, but clearly beyond the constitutional power of the Legislature. The Constitution, y article 4, § 43, provides that—

" The Legislature shall pass no bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."

Under the circumstances above stated the mortgagor would be compelled to pay upon his mortgage the amount of the mortgagee's tax, five years before any amount was due thereon. This compulsion of payment precipitates the maturity of the obligation, and changes the contract between the parties, in violation of the above provision of the Constitution.

In *Lyon v. Receiver of Taxes*, 52 Mich. 271, it appears that a tax was assessed against Cornwell, Price & Co., a

corporation doing business in Detroit, and after the assessment and levy of the tax the corporation made a common-law assignment for the benefit of creditors to plaintiffs, who accepted the trust and entered at once upon their duties. On the day of the assignment, and after it was made, efforts were made by the defendant, as receiver of taxes, to collect the same. On December 22, he entered the store of plaintiffs, and threatened to take possession of and sell the assigned property to pay the tax, which amounted to $667.78. The plaintiffs, to prevent this, paid the tax under protest, and on the following day brought suit in *assumpsit* to recover this amount. The city charter of Detroit provided that the city taxes should be a lien upon the property assessed until paid. This Court held that provision did not apply to personal property. The defendant claimed that it was his duty to enforce the collection of this tax against the plaintiffs' property under the assignment; that his act in so doing was official, and had the color of right; therefore he was not personally liable. It was said by this Court:

"Several cases decided by this Court have been referred to as supporting this position, but they are not applicable to the facts in this case. This was not the case of a person whose property had been illegally assessed, and against whom the collector's warrant ran, but an attempt to take the property of one person to pay another person's tax. This cannot be done, under our Constitution or laws. It would be the grossest injustice, and finds no support in the decisions of this Court."

But, again, if the mortgagee does not pay the tax, and it is not collected of the mortgagor by distress, it becomes a lien upon the land of the mortgagor, and thus the property of the mortgagor is taken to pay the mortgagee's taxes. Under this law the assessment or listing and valuing of property is made in April or May, but no

taxes are levied until after the October meeting of the board of supervisors, and they become a lien upon real and personal estate only on and from the 1st day of December. Mortgages are often accompanied by a note to which the mortgage is collateral. The note may be negotiable paper, which passes from hand to hand by delivery or indorsement, and in equity carries with it the mortgage security, without actual assignment. It may have been purchased in reliance solely upon the responsibility of the maker or indorsers. A purchaser of such paper, in good faith and for value, before maturity and before the tax becomes a lien upon the mortgage, has a right to enforce it against the maker for the full extent called for by the promise upon its face; and it is not subject to offset for taxes assessed against the payee and paid by the maker. The mortgagor cannot, by payment of the tax assessed against the mortgagee, offset it against the *bona fide* assignee, who under the law was not liable to pay the tax. The mortgagor paying the tax of the mortgagee, under such circumstances, would have no means of enforcing repayment by an offset against the mortgage.

Mr. Justice CAMPBELL, in *Attorney General v. Supervisors of Sanilac County*, 71 Mich. 31, says:

"A mortgage, under our legislation, conveys no legal or equitable estate in land. It is no more and no less than a collateral security upon land, which has no value in itself, but depends entirely on some outside obligation, from which it is inseparable. If it is given to secure a debt, it belongs to the owner of that debt, and passes with it to any lawful holder, without assignment. If the debt is negotiable, it passes to any one to whom the paper belongs. If it is given to secure several debts or several installments, it belongs ratably to as many persons as there are owners of these. It may be given by way of indemnity, and in that case it may never have

any money value. It may be given for a debt amply secured by other mortgages on other property, or it may be on property already so heavily incumbered as to make it no security at all. So the mortgagee may be a mere trustee, with no interest himself in it."

There are many other circumstances which might be stated where it would be impossible to separate these interests, and enforce the payment of the tax out of the goods of the mortgagor, without violating the obligations of the contract.

The obligation of a contract is the law which binds the parties to perform their agreement. *Sturges v. Crowninshield,* 4 Wheat. 197. In *Green v. Biddle,* 8 Wheat. 84, it was said:

"The objection to a law on the ground of its impairing the obligation of a contract can never depend upon the extent of the change which the law effects in it. Any deviation from its terms by postponing or accelerating the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are, however minute or apparently immaterial in their effect upon the contract of the parties, impairs its obligation."

"One of the tests," say the court in *Bank v. Sharp,* 6 How. 327, "that a contract has been impaired, is that its value has by legislation been diminished. It is not, by the Constitution, to be impaired at all. This is not a question of degree or manner or cause, but of encroaching in any respect on its obligation, dispensing with any part of its force."

In *Bourgette v. Williams,* 73 Mich. 214, it was said:

"The obligation of a contract is said to consist in its binding force on the party who makes it. This depends upon the law in existence when it was made. These laws are necessarily referred to in all contracts, and form a part of them, as the measure of the obligation to perform them by one party and the right acquired by the other; and, if any subsequent law affects to diminish the duty or to impair the right, it necessarily bears upon the

obligation of the contract in favor of one party to the injury of the other."

At the time these prior mortgages were made, the law then in force did not permit the mortgagor's property to be seized to pay the tax of the mortgagee. It is now sought by the present law to authorize such seizure. To my mind, no plainer case could be stated where an attempt is made by the Legislature, by subsequent enactment, to impair the obligation of existing contracts; and these unconstitutional provisions are so interwoven in the law that no part of it can be carried out.

This position is sought to be answered by the proposition that, inasmuch as it would be competent for the Legislature to cause the entire value of the land to be assessed to the mortgagor, therefore it does not impair the obligation of the contract between the mortgagor and the mortgagee to compel the mortgagor to pay that part of the tax assessed to the mortgagee. The illustrations of the workings of the law before given are sufficient answers to this proposition. Under the present law the mortgage interest is not assessed to the mortgagor at all. It is assessed to the mortgagee, and then the tax may be collected by distress of the property of the mortgagor; and in the last illustration used, the assignee of the mortgagee, if he procures it before the tax becomes a lien, and for value, takes it freed of any obligation to pay to the mortgagor after payment by him of the tax. Again, let it be supposed that one class of mortgagees pay their taxes, and thus relieve the mortgagors of the burden. Another class of mortgagees fail to pay, and the mortgagors are compelled by distress to make the payments. We have the anomaly of the Legislature compelling in one instance tha payment of a part of the tax upon the land by the mortgagee, and in another case, where the mortgagee does not pay, compel-

ling the mortgagor to make the payment, which, we have seen, he may not always be in a position to collect back. This destroys the uniformity of taxation, which is provided by the Constitution in article 14, § 11.

It is also said that the imposition of this burden upon the mortgagor does not impair the obligation of contracts, for, if the mortgagee does not pay, the State simply appropriates so much of the fund which the mortgage represents as is necessary to pay the tax before it reaches the mortgagee. In other words, it is proposed to permit the State to take the money of one man to pay the debt of another, or to appropriate a fund not yet due and compel its payment before due; that is, compel the mortgagor to make payment upon his mortgage long before anything is due thereon, so that the State may get its revenues,—the very thing which the Constitution prohibits. The assumption that this may be done is based upon the idea, as before stated, that the Legislature might in the first instance have compelled the assessment upon the land of the whole tax. The idea upon which the act was brought into existence was that this was unjust, and a burden upon the land owner, from which he ought to be relieved, and therefore the part which the mortgage bears should be assessed against the holder of the mortgage. This undoubtedly could have been done, if the Legislature had confined the provisions of the act to mortgages thereafter made; but it is beyond the power of the Legislature to change existing contracts between the parties to the extent pointed out.

Many mortgages contain a provision that the mortgagor shall pay all the taxes assessed on the land. By the act the Legislature attempts, in violation of such contracts, to divide the tax, and compel the payment of a part of it by the mortgagee, which by section 35 of

the act may be done by seizure of his personal property. That section provides:

"If any person shall neglect or refuse to pay any tax assessed to him, or upon any mortgage or other obligation taxed as an interest in lands owned by such person, as provided by this act, the township treasurer shall collect the same by seizing the personal property of such person, to an amount sufficient to pay such tax, fees, and charges for subsequent sale, whenever the same may be found in the county, from which seizure no property shall be exempt."

The law under which the mortgage was given did not prohibit the entering into contracts by which the mortgagor was compelled to pay the tax assessed upon the whole land. The contract in the mortgage is that the mortgagor shall pay the tax. The Legislature now provides that the amount of the mortgage shall be deducted from the value of the land, and that the mortgagee shall pay the tax on that part, and compels the payment by distress of his personal property. A bare statement of this proposition shows a violation of the Constitution, as it clearly violates the obligation of the contract.

The whole scheme of taxation of mortgages, and the collection of the taxes thereon, by the methods pointed out by this act, is so defective that for this reason the whole act should fail. Let us take a few examples of the practical workings of the scheme. The mortgage interest is to be assessed in the taxing district where the land is situated. In case the mortgage covers lands in more than one taxing district, which is frequently the case, the law provides as to future mortgages, when this is shown to be the case, that they shall not be entitled to record unless there be appended a statement showing the proportionate amounts to be assessed as an interest on each parcel in the different assessing districts. There is no sufficient provision in regard to existing mortgages for ascertaining

these facts.    The only provision relating to them is
that—

"It shall be the duty of the holder of any such mort-
gage  *  *  *  to file with the supervisor or other assess-
ing officer of the township or assessing district in which
the land or real property affected thereby is situated,
before the 10th day of April of each year, a written
statement, under oath, of all his estate situated in such
township or assessing district, liable to assessment and
taxation under the provisions of this act; otherwise, a
written statement of the mortgagee's interest in any
such real estate may be filed with the supervisor by the
mortgagor or owner of the fee."

In other words, as to existing mortgages the only means
the assessing officer has in ascertaining the value of the
mortgage interest in each parcel, when situate in sep-
arate assessing districts, are these statements of the
mortgagor or mortgagee.    If they are both non-
residents, as the case often happens to be, and the
mortgage is upon real property in different assessing
districts, there is no way pointed out, except as above
stated, to ascertain the facts; and, if the parties are not
accessible, then no means is given to ascertain the facts.
Let us suppose the case of a mortgage given by a resident
of Detroit, or by an owner residing out of the State,
upon lands in Oscoda and Roscommon counties, in the
Lower Peninsula, and Chippewa county, in the Upper
Peninsula.    The supervisors in Oscoda county or Roscom-
mon county enter the land for assessment upon their respec-
tive rolls, and then find it incumbered by a mortgage cover-
ing lands in the other two counties, and they attempt
to apportion the mortgage upon the several parcels of
land in all the counties according to their respective
values.    How can it be done?    The land is assessed,
"Owner unknown."    The mortgagee is a non-resident.
Neither can be reached.    Must a supervisor ascertain the

facts and apportion? And, if the facts cannot be found, how shall he apportion? This is one of the many problems which the law, in its crude state, presents.

Again, in the matter of review under this statute. If the mortgagee does not appear before the board of review, he will be barred from contesting the amount of his tax in any court, as he will have had an opportunity to appear before that body, and such an appearance or opportunity for an appearance would be regarded as his day in court upon the question of the amount of his assessment. Mortgagees must therefore be on the watch in every assessing district where their mortgages may be assessed,—and a mortgage may be assessed in every assessing district where any of the land lies covered by it,—or suffer the consequences of an overassessment or overvaluation by each assessing officer on the one mortgage. Take the case of the savings banks and insurance companies situated in Detroit, all of which are organized under the laws of this State. They own nearly $14,000,-000 of real-estate mortgages, held by them as security to depositors in banks and policy-holders in insurance companies. Many of these mortgages cover more than one piece of land, and presumably lands which are situated in two or more taxing districts are covered by the same mortgage. These mortgages are upon lands in different parts of the State. The assessing officers not having the values at hand by which they can apportion the mortgage according to the value of each parcel of land, each assessing officer may assess the mortgage in each district according to his own view as to the proportion which it bears to the whole land. Must the bank or insurance company, in order to prevent an overvaluation in each district, appear before the board of review, or in default thereof be held to the amount

assessed against the mortgage in each district? The law does not define how these matters may be arranged.

Many other defects could be pointed out, and the imperfections of the law shown. These defects may not prove insurmountable barriers to a valid assessment, but I have cited them to show the difficulties of carrying the law into effect.

Upon the questions which have not been discussed by my Brother GRANT or myself, I concur fully in the views of my Brother MONTGOMERY.

I am of the opinion, however, that the writ of *mandamus* should be denied.

GRANT, J. This is an application for the writ of *mandamus* to compel the respondents, who are the assessors of the city of Detroit, whose duty it is to assess at its true cash value all the real and personal property in the city, and to make out the assessment rolls, to comply with the provisions of Act No. 200, Laws of 1891, which require them—

1. To assess the value of any land contract to the owner of such security as real estate.

2. To assess as real estate, to the owner thereof, the value of any real-estate mortgage executed before the tax law of 1891 went into effect.

3. To assess to any savings bank or insurance company, as real estate, the value of any real-estate mortgage owned by such bank or insurance company, executed since said tax law took effect.

4. To assess the value of any real-estate mortgage executed since said tax law took effect to the owner thereof, as real estate.

5. To assess the value of any real-estate mortgage executed since said tax law took effect, and owned by a non-resident of this State, to such non-resident owner, as real estate.

6. To deduct the value of all real-estate mortgages owned by any savings bank or insurance company from the value of the capital stock of such bank or insurance

company, as determined for assessment purposes by the statute in such case made and provided.

The respondents answered, alleging various reasons against the constitutionality of the act.

The first question for determination is whether the act approved by the Governor and deposited with the Secretary of State is the act which passed the Legislature. Courts will not go behind the legislative journal for any evidence touching the validity of an act of the Legislature. We must be able to determine from an inspection of the journal that the act as signed did not pass, in order to declare it void. The history of this act, as found in the journal, is as follows:

Early in the session a joint special committee of the Senate and House was appointed, to which were referred the recommendations of the retiring and incoming Governors on taxation, with instructions to prepare and report a general tax bill. Three general tax bills were introduced,—two in the House and one in the Senate,— and referred to this committee. The House bills were numbered 178 and 984, and the Senate bill, 325. April 17 this committee reported a substitute for House bill No. 178, which was concurred in, ordered printed, and referred to the committee on judiciary. House Jour. 1246.

June 19, the judiciary committee reported to the House House bill No. 178 (file No. 340), entitled "A bill to provide for the assessment of property, and the levy of taxes thereon, and for the collection of taxes heretofore and hereafter levied, and to repeal Act No. 195 of the Session Laws of 1889, and all other acts in any wise contravening any of the provisions of the same;" reported a substitute therefor; recommended the substitute be concurred in and passed. This report was accepted, the committee discharged, and the substitute ordered printed, and made the special order for the next Tuesday. House

Jour. 2050.. June 23, which was the following Tuesday, appears another report from this same committee, and in precisely the same language, upon the same bill, which report was accepted and the committee discharged. The bill was then made the special order for June 24. Id. 2066. June 24 appears another report from the same committee upon the same bill, and in precisely the same language. Again the report was accepted and the committee discharged. A vote was taken, and the House did not concur in the substitute. The original bill was then referred to the committee of the whole, and placed on the general order. Id. 2082, 2083.

The bill was considered in committee of the whole June 27, which reported that they had had under consideration "substitute for House bill No. 178 (file No. 340), entitled 'A bill,'" etc. (giving the same title as above); that they had not gone through therewith, and asked leave to sit again, which was granted. Id. 2156. The same bill was further considered in the committee of the whole on the same day, and the committee asked leave to sit again. Id. 2157. The same bill was again considered in committee of the whole June 29, but its consideration was not completed, and leave was granted to sit again. Id. 2163. The like proceedings were repeated the same day upon this same bill. Id. 2164. At the evening session of the same day the bill was further considered in committee of the whole, when the same was reported back to the House with sundry amendments thereto, in which the House was asked to concur, and its passage recommended. The House concurred in the amendments, and the bill was placed on the order of third reading. Subsequently the vote by which they concurred in the amendments was reconsidered, and a motion was made to concur in all the amendments, except the amendments made to section 17 and section 12, which

motion prevailed. A motion was then made to concur in the amendments made to section 17, which motion prevailed. A motion was also made to concur in the amendments made to section 12, which motion did not prevail. The motion by which the House concurred in the amendments to section 17 was then reconsidered, and pending the motion to concur in these amendments the following motion was made: "That the bill be laid on the table, and ordered printed as a supplement in to-day's journal." This motion prevailed.

Two resolutions were then passed by the House,—one declaring that it was desirable to incorporate into the tax laws of this State the California mortgage tax system, as provided in House bill No. 178 (file No. 340); the other declaring that it was desirable to incorporate the county system for the collection of delinquent taxes, as provided for in the same bill. House Jour. 2167, 2168. The bill was printed in the journal as directed, under the heading:

"Supplement to House Journal. File No. 340. House of Representatives. Substitute for Senate bill No. 178. (Introduced by Mr. Doremus.) Ordered printed for the use of the committee on judiciary. Lansing, June 29, 1891."

It is conceded that the expression, "Substitute for Senate bill No. 178," should read: "Substitute for House bill No. 178." This was a clerical error, and corrects itself, since no tax bill by that number was pending in the Senate. A statement of this clerical error is made in the index to the journal. The bound volumes of the journal are now produced, and this bill, which the House ordered printed in that day's journal, is omitted therefrom.

July 1 it appears from the journal that,—

"On motion of Mr. Doremus, House substitute bill No.

178 (file No. 340), entitled   *   *   *   was taken from
the table and put upon its immediate passage."

Several amendments were then made to the bill by the
House, which appear in the bound volumes of the jour-
nal on pages 2199 to 2201, and on pages 1431 and 1432
of the journal as issued daily. I do not consider it nec-
essary to state them here. The bill was then passed and
sent to the Senate, and on the same day the Senate
returned the bill to the House, reporting that it had
passed the bill with some amendments. These amend-
ments were concurred in by the House, appear upon the
journal, and are in the act as signed by the Governor.

July 1, while the bill was being considered by the
House, and just before its passage, the journal contains
the following:

"Mr. Doremus moved to further amend the bill as
follows:

"1. By striking out sections 109, 110, 111, 113, and
116.

"2. By inserting in line 3 of section 114, after the
word 'such,' the word 'blank,' and after the words
'forms of,' the words 'delinquent tax record, certificates,
deeds, and other necessary papers.'

"3. By inserting in line 5 of section 115, after the
word 'accrued,' the words 'or may hereafter accrue.'—

"Which motion prevailed. The question recurring to
the passage of the bill, pending the taking of the vote
thereon, Mr. Doremus moved that there be a call of the
House, which motion prevailed."

After the roll of the House was called, the pending
bill was laid on the table. Shortly after this, on the
same day, by unanimous consent, the bill was taken
from the table and placed upon its immediate passage.
Here, again, a clerical error was committed, by referring
to the bill as "House substitute for Senate bill No. 178;"
but it was also referred to as file No. 340, and the title
given identical with the one just before laid upon the

table. There is no doubt that the bill then passed was the same as that which had just before been laid upon the table, nor does any one contend that it is not. It also affirmatively appears that the bill taken from the table was the identical bill which had been laid upon the table, ordered printed, and printed in the journal. The record last above stated is taken from the daily journal of the House, as it was issued and published at the time, and sent to the various State, county, and township officials, as containing the records and proceedings of the House. See page 1432 of the daily journal. The bound volume, No. 3, of the journal, is now produced, with the certificate of the clerk of the House of Representatives attached thereto, certifying that it is a correct journal of the proceedings of the House of Representatives for 1891. There now appears at page 2201 of this bound journal, after the three amendments above given, and between the words "which motion prevailed" and "the question recurring to the passage of the bill," the following:

"Mr. Doremus stated that certain sections of the bill had been stricken out and some added in the committee of the whole, which, with the above amendments, would not leave the sections in consecutive order; and thereupon Mr. Doremus further moved to amend the bill by directing the engrossing and enrolling committee to renumber the sections of the bill so that they should be numbered, as near as may be, by consecutive numbers; which motion prevailed, and the sections of the bill were thereupon accordingly renumbered."

It is apparent that the numbering of the sections might have been done by the committee on engrossment and enrollment without any instruction from the House, and without in any manner affecting the validity of the bill.

It must first be determined whether the bill ordered

printed, and actually printed, in the journal as a supplement, constitutes a part of the journal. If it does, then the clerk of the House had no authority to leave it out of the bound volume. He possesses no power under the Constitution, or under any legislative action, to add to or take from the journal which the House has made and published. He can only make corrections under the authority and direction of the House. After the Legislature has adjourned, the sole authority possessed by him is to see that the journals, as made, corrected, and approved from day to day, are correctly published and bound, and given to the people of the State for preservation in a lasting form, as the correct and exact proceedings of that body. He may possibly have the right to correct grammatical or clerical errors which appear upon the face of the journal. To hold that he may do more would be not only absurd, but it would be monstrous. If clothed with that power, he might change and control legislation at his will. His certificate, made after the Legislature has adjourned, possesses no such sanctity.

Courts will go behind the acts of the Legislature, published by authority, to the written act, as signed by the Governor and found in the office of the Secretary of State, to ascertain what the law is. For the same reason, they will go behind the bound volumes of the journal, to the record made and approved by the Legislature, to ascertain what that journal is. The language of this. Court in *Rode v. Phelps*, 80 Mich. 609, speaking through my Brother MORSE, applies with equal force to the facts of this case, viz.:

"If the rule prevailed here which is adopted in some of the states of the Union, that the courts have no power to go behind the authentication of a law by the presiding officers of the Legislature and the approval of

the Governor to ascertain whether or not it was legally passed, under the requirements of the Constitution, we should always be in danger of having laws upon our statute-books which, although the courts would be obliged to hold them valid under such a rule, were never passed by the Legislature, and were really created by the carelessness or corruption of some member, clerk, or employé of that body, or perhaps by the interpolation of a member of what is sometimes facetiously called the 'Third House,' but which is nothing more nor less than an organized and generally unscrupulous lobby."

Courts will take judicial notice of the methods of procedure in the Legislature. No written journal is kept by the House or Senate. The journal, as published and placed upon the desks of the members every morning, is the only record kept of its proceedings. By resolution of the House, the record of its proceedings, called the "Journal," was sent daily to the various township, county, and State officials, including the Secretary of State and the members of this Court. For what purpose, other than to be received and acted upon as the official record of its proceedings, and the original record thereof?

Rule 8 of the House Rules is as follows:

"Upon the announcement by the clerk that a quorum of the House is present, the journal of the preceding day shall be read, unless otherwise ordered by the House, and any mistake therein corrected."

It is provided by Rule 11 that,—

"After correcting the journal of the preceding day, the order of business shall be as follows," etc.

In practice, under these rules, the record of each day's proceedings, as it appears in this journal, which is in the hands of every member, stands approved, unless a correction is suggested and made, which will then appear in the journal the next day.

Section 15 of Howell's Statutes provides for printing

and binding, in volumes of convenient size, "the official journal of the Senate and House of Representatives." The Legislature of 1891 provided, by concurrent resolution No. 12,—

"That the secretary of the Senate and the clerk of the House of Representatives be and they are hereby directed to compile and prepare for publication, make indexes, and superintend the publication of the journals," etc.

What constitutes this "official journal" mentioned in the statute, and "the journals" mentioned in this resolution? Has there been no official journal before this time? Can there be none until one is compiled, indexed, and bound into volumes, which do not and cannot appear for months afterwards? Is there no official journal in existence, of which courts will take judicial cognizance? If a question arises as to the passage of a law enacted early in the session, and given immediate effect, to what "official journal" will the courts resort to determine it while the Legislature is in session? Ample opportunity is now offered to test such questions in the courts before the adjournment of the Legislature. The Constitution also requires each house to keep and publish a journal of its proceedings.

The decision in *Attorney General v. Burch*, 84 Mich. 408, went no further than to hold that the clerk, under a resolution directly authorizing him, might make corrections before the Legislature adjourned. In the present case the clerk omitted this part of the journal from the copy he certified, not by any direction of the House nor to correct any error, but upon his own motion, and apparently because he did not consider it a part of the journal.

The liquor tax law of 1889 was printed in the journal

of the House under precisely the same language as was used in the present case, except the words "as a supplement." The term "in the journal" means what it says, and has but one meaning. To print "in the journal, as a supplement," has the same legal significance as to print "in the journal." In *Rode v. Phelps,* 80 Mich. 598, the bill which was printed in the journal was considered by this Court as the bill then pending before the House, and from an examination of the journal, taking that as the pending bill, it appeared that the bill passed by the Legislature was not the one signed by the Governor. It is true that in that case the bill "as amended" was ordered printed, but I do not regard those words as possessing any significance. By "the bill," when laid on the table and ordered printed, is meant, not the bill as it was introduced, but the bill then in possession of the House, under consideration, and as amended. Any other construction would be doing violence to the plain meaning of the language. The object of printing it was to place it, as it then stood, before each member of the House, for his personal examination and guidance, by reason, undoubtedly, of the short time remaining for the consideration of so important a measure. This supplement is brought into court by the Secretary of State, in whose office it is found, and to whom it was sent when published, and who has preserved it there ever since, as a part of the legislative journal, issued by authority. Its identity cannot be, and is not, denied. Upon reason, common sense, and grounds of public policy, this supplement must be taken and considered a part of the journal.

But it is insisted that the words, "ordered printed for the use of the committee on judiciary," appearing on the supplement, show that it was not published for the use of the House. The fallacy of this claim is apparent when it is considered that the committee on the judiciary had

before this reported the bill to the House, had been discharged from its further consideration, and that it was at no time thereafter referred to them. Those familiar with legislation will know that these words were on the original bill before it was reported by the committee to the House.

It is also urged that this daily journal may be produced from a supervisor, or from any person to whom it was sent, and who has taken the pains to preserve it, and be received to contradict the bound volumes. This position might be tenable if the bound volume were the original record. But it is not. No one original is made or kept. Each number issued is an original. This journal; issued daily to its members and to the people of the State, purports to be made and published by authority, is in fact made and published by authority and bears upon its face its own authentication. It and the bound volumes are both published by authority, are open to the examination of the courts, and it is of no consequence whether they are found in public or private libraries, in public or private offices, in the possession of members of this Court or of private individuals. When produced, each authenticates itself. The Legislature has provided that both shall be sent to the members of this Court. When so sent and received, by which are they to be governed? We are not pointed to, nor can I find, any statute which makes this bound volume conclusive evidence of the proceedings of the Legislature. It follows in the present case that this journal, as issued daily, preserved by the Secretary of State, and produced to this Court, is one of the original, official journals of the House, and to it we must look to determine what action the House took, and what it did not take, upon the act in question.

The following cases are cited in support of the position

taken by relator, viz.: *McCulloch v. State*, 11 Ind. 424; *Turley v. Logan Co.*, 17 Ill. 151; *Post v. Supervisors*, 105 U. S. 670; *Attorney General v. Rice*, 64 Mich. 385. An examination of these cases shows that the question now under consideration was not either directly or indirectly involved.

In *McCulloch v. State*, evidence was offered to show that two members who were shown by the record as having voted for the bill were not present and did not vote for it, and that another member, who was recorded as having voted for it, in fact voted against it. It was with reference to this state of facts that the language in that opinion was used. No dispute arose as to what was in fact the journal. It is there said:

"The house keeping the journal is the only tribunal by which it can be corrected, and, until corrected by such authority, it must be considered conclusive as to the facts which it contains."

Applying this language to the present case, and where is found any correction of the journal by the only tribunal which can correct it?

In *Turley v Logan Co.*, a correction was made at a subsequent session by the legislature itself, and in the decision is this language:

"We cannot doubt the power of the same legislature, at the same or a subsequent session, to correct its own journals by amendments which show the true facts as they actually occurred, *when they are satisfied that by neglect or design the truth has been omitted or suppressed.*" (The italics are my own.)

So far as this language is applicable to the present case, it is clear that the Legislature alone can make the correction, and that it must appear on the journal as made by its authority.

In *Post v. Supervisors* the law was held void because the journals did not show it to have been enacted in

conformity with the requirements of the constitution; and Mr. Justice Gray, in delivering the opinion, says:

"If the journals, being produced or proved, fail to show that an act has been passed in the mode prescribed by the constitution, the presumption of its validity, arising from the signatures of the presiding officers and of the executive, is overthrown, and the act is void."

Under the statute of Illinois,—

"The copies of the original daily journals kept by the clerks of the two houses, made by persons contracted with or employed for the purpose, as authorized and directed by that act, * * * in well-bound books furnished by the secretary of state, pursuant to the duty thereby imposed upon him, and afterwards deposited and kept in his office, are official records in his custody, copies of which, certified by him, are admissible, upon settled rules of evidence; * * * and neither the competency nor the effect of such copies is impaired by the loss or destruction of the daily journals or minutes."

It is further said:

"The copies of the journals, certified by the secretary of state, and the printed journals, published in obedience to law, are both competent evidence of the proceedings in the legislature."

If in that case the daily "journals" or "minutes" had been "produced" or "proved," and they had differed from the bound books, by which would the court have been guided? See same case, reported in 94 U. S. 260.

In *Attorney General v. Rice*, Mr. Justice MORSE, speaking for the Court, referred to these "journals kept by the clerk of each house, and read and corrected each day by each body, and duly certified by the proper officers to be correct." If the bound volumes differ from these journals, "kept, read, and corrected, each day," which should govern? The offer in that case was to contradict the journal, which showed that a certain bill was

introduced, by showing that it was a skeleton bill, with a head but no body.

I cite also, in this connection, *Miller v. Goodwin*, 70 Ill. 659. In that case the statute of Illinois required the secretary of state to record in a bound volume prepared and kept in his office for that purpose the daily proceedings of the legislature. The proper officers of the respective houses kept the minutes of their proceedings upon blanks furnished to them. These were daily sent to the secretary of state, recorded in this book, which was called the "Journal Record," and, after they were so transcribed, he sent them to the public printer, and they were never returned. Objection was made that the journal record was not the original record, and parol proof was offered of the proceedings of the legislature to contradict this record. This was held incompetent. In that case this record was made by law the official record. In the present case, as already stated, the journal published daily is the official record. The court in that case said:

"Public information of the proceedings is required to be furnished by publication; and, if this record is not designed to be a permanent depository of the evidence of the proceedings required to be copied into it, then we must presume that the law requires the making and preservation of a public record with no end in view."

The next question for determination is whether the statement and motion appearing in the bound volume, and above given in full, are a part of the official journal of the House. As already stated, they do not appear in the journal of July 1, as it was published at that time. The Legislature continued in session July 2 and 3, and neither in the journals of those days, as they were then published, nor as they appear in the bound volume, is there found any correction of the journal of July 1, nor any reference whatever to any such state-

ment or any such motion as a correction. The Legislature adjourned without making any such record. That it was inserted after the adjournment is beyond dispute. Its effect is to contradict the official record, which had then been made and published to the people of the State. No record of it having been made anywhere in the journal prior to the adjournment, the legal presumption follows that no such action was taken. That courts, on the ground of public policy alone, should not recognize them as a part of the journal, is, in my judgment, too clear to require argument. If the clerk may add to the record, as left in his hands to compile, he may also take from it; and thus he, either alone or in combination with others, may defeat the will of the people. Suppose he, either intentionally or inadvertently, should leave out of the bound volume the record of the vote by which a bill had passed the House by a yea and nay vote, as required by the Constitution, § 19, art. 4. Can it be possible that courts are not clothed, not only with the right, but the duty, to examine the original journals, and thus enforce the people's will?

The conclusion that no such proceedings took place can safely rest upon the records as above given. But they are not the only evidence within our reach. Whatever of credit is to be given to these bound volumes is not derived from the fact that they are bound, but from the certificate of the clerk, attached thereto, that it is a correct journal of the proceedings, and the fact that they are published by the Legislature as its official journal. That is what gives it its official character contemplated in the statute and resolution above referred to, and determines its *prima facie* authenticity and correctness. Courts, in their search for the truth as to what the proceedings actually were, will examine an unbound as well as a bound copy. The compilation and publica-

tion of the official journal required a repaging, different from that of the journal as issued daily. The record of the proceedings now under discussion is found on page 1432 of the original journal issued at the time, and on page 2201 of the bound volume. Since the argument a printed copy has been handed to me by counsel for respondent, as prepared by the clerk of the House, for printing and binding into volumes, with pages the same as those i the bound volume, and with the clerk's certificate attached thereto, in which, on the same page, viz., 2201, is found a record of these proceedings; and it corresponds exactly with the record of the journal as issued daily at page 1432. It thus appears that this journal, covering, as bound, 2286 pages, was prepared by the clerk, certified to by him, placed in the hands of the printer, repaged, and printed, without the disputed proceedings appearing in it, and without any reference whatever thereto. How, then, is it possible to reach any other conclusion than that this statement and motion were inserted after the Legislature had adjourned, by some one without authority?

· Of the right of this Court to examine this copy, there is no doubt. When the case of *Auditor General v. Board of Supervisors of Menominee Co.*, 89 Mich. 552, was heard, October 29 and 30, 1891, this Court was referred to the unbound numbers of the Senate Journal, certified to by the secretary of the Senate, for the official record of the Senate on the act then in question, and they were accepted without objection as an official record of the proceedings of that body. If, when bound, that record should be found to differ from the record then before the Court, by which should it be governed, in the absence of any evidence upon the journal of a correction by the Senate?

It is established beyond controversy that the bill, as

printed in the journal June 29, was the identical bill then under consideration, the one to which amendments were made by the House, and which, as amended, should have been engrossed and enrolled, and signed by the Governor. There is no claim that any amendments were made by the House after the bill was printed in the journal which do not appear upon the journal. Putting the bill and these amendments together, it is impossible to make up the bill which was afterwards signed by the Governor and printed in the Public Acts. There was no other substitute for House bill No. 178, except this one, and no other which was known as "File No. 340." The first 19 sections of the act, as printed, are identical in subject-matter with the first 19 sections of the printed bill in the journal, and are also identical in language, except in so far as they are in a few instances modified by the amendments shown to have been passed by the House, and a few provisions which the journal nowhere shows to have been stricken from the bill then pending. Sections 85 to 109 of the act, inclusive, are also identical, both in subject-matter and in language, with sections 84 to 108, inclusive, of the bill, while sections 109, 110, 111, 113, and 116 of the bill as printed, and which the journal shows were stricken out, do not appear in the act as signed. Another conclusive evidence that the bill printed in the journal was the identical bill under consideration, and to which amendments were made, is the fact that the bill as printed contained 116 sections, 5 of which, as already shown, were stricken out, while the bill signed by the Governor contains 111 sections, just the 5 sections less.

It is said by counsel for relator, in his brief:

"Every affirmative amendment proposed [referring to the amendments found in the journal] is found in the act as now enrolled."

This is undoubtedly true, and these amendments can all be traced to their proper place in the bill printed in the journal. The lines as printed in the journal were not numbered. It is well known that the lines of the sections of bills printed for use in the Legislature are numbered. All the amendments made to the bill by the House, except four, were made by Mr. Doremus, who evidently had charge of the bill. Of these four, three were proposed by Mr. Richardson, and one by Mr. Conner. In proposing these amendments, reference was made to the sections and lines by number, except in case of the amendment proposed by Mr. Connor. Evidently, those proposing these amendments had before them a printed copy of the bill, with the sections and lines numbered. This was evidently for convenience in directing the attention of the members, as well as the clerk, to the place where the amendments were to be made. But it cannot be argued from this that the House had before it a bill different from that which they had laid upon the table two days before, and ordered printed. Nor is there, in my judgment, any foundation in fact for even a supposition to that effect.

When a bill by order of the House is printed in its journal, as the bill then pending, is shown by the same journal never to have been referred to any committee, but to have received certain amendments, which appear in full upon the journals and then, as thus amended, to have passed both branches of the Legislature, such bill, as thus amended, is the one that has become enacted into law, and having received the solemn sanction of the Legislature. If the bill, when engrossed and enrolled, and signed by the Governor, contains other provisions, it is null and void, and must be set aside. This I believe to be the rule founded upon authority and reason. See

authorities above cited; also *Ryan v. Lynch*, 68 Ill. 160, and authorities there cited. Tested by it, the tax law of 1891 cannot be sustained. It differs from the act which passed the Legislature, as appears by the House Journal, in several essential particulars. I deem it necessary to mention but one. It was the intention of the Legislature to incorporate into this law the California system of taxing mortgages. For this purpose the law declares that mortgages shall be considered real estate; that the value of the mortgage shall be deducted from the value of the land, and each assessed accordingly. Section 17 of the bill and section 17 of the act cover this subject. Section 17 of the bill printed in the journal contains this clause:

"Every contract hereafter made, by which a debtor obligates himself to pay any tax assessed on the interest of the holder of any mortgage, deed of trust, or other lien, shall, to the extent of such obligation, be null and void."

This provision does not appear in the bill signed by the Governor, nor in the act as published in the Public Acts. The House Journal does not show even an attempt to strike it out. The only record to be found anywhere in regard to it is on the printed copy of the bill, with riders attached, found in the office of the Secretary of State, and which is claimed to be the bill as passed, and from which the engrossed copy was made; and there, opposite this clause, is found the following pencil memorandum: "Richardson says this was struck out." But I do not consider this as competent evidence. It is to the journal that we must look. By the absence of this provision from the law, it is shorn of all its force and effect, so far as taxing mortgages is concerned; for it is now conceded by counsel for the relator that under the

act as it is the mortgagor and the mortgagee may make a valid contract, by which the mortgagor must pay the taxes. Common experience tells us that every mortgagee would insist upon such a contract, and that, therefore, no relief is afforded in this respect to the mortgagor by the act as it now appears. This was an important and radical provision. We cannot assume that the Legislature intended to leave it out. The journal records that they did not, and it must prevail.

It is of no avail to say that certain sections of the bill printed in the journal are not contained in the law, nor that the law contains certain sections which do not appear in the printed bill. This may seem strange, as was said in *Attorney General v. Joy, infra,* but this furnishes no basis for courts to infer that amendments were made which the journal does not show. The journal must control. In *Attorney General v. Joy,* 55 Mich. 94, the bill under consideration required the vote of two-thirds of the members to secure its passage. The journal showed one vote short of this number, but the bill was declared carried by the requisite majority, and the parties interested acted upon that assumption. It was urged that there was evidently a mistake in the journal, but the Court said, speaking through Chief Justice COOLEY:

"There was a considerable vote in opposition to the act in question, and, if the vote in its favor was insufficient, it seems strange that attention was not challenged to the fact immediately;   *   *   *   and it seems incredible that, if a mistake was made in declaring a bill passed which had not received the necessary vote, the mistake should not have been discovered as early as the day following.   *   *   *   But we cannot now judicially determine that there was any such mistake. The legislative journals furnish no proof of it, and it remains merely a plausible conjecture."

The act in question should be held void, and the writ.

of *mandamus* denied.    It would follow that the pre-existing tax laws are in force, and  that  the  assessment and collection of taxes must proceed under them.

I  concur  in  the  conclusion   reached  by  my  Brother Long, that the law is unconstitutional.